Russell E. GIESELMANN et al., Plaintiffs (Respondents),

v.

Robert H. STEGEMAN et al., Defendants,

Frank G. Kirtz, etc., Defendant (Appellant).

Nos. 54361, 54362.

Supreme Court of Missouri, Division No. 1.

July 14, 1969.

Aubrey B. Hamilton, Edward D. Weakley, St. Louis, David M. Dolan, St. Ann, for respondents.

Frank Mashak, St. Louis, for appellant.

PER CURIAM:

This opinion disposes of two appeals arising out of the same case, originally appearing on our docket as Cases Nos. 54361 and 54362. The two appeals were consolidated. No. 54361 is an appeal by defendant Frank G. Kirtz (hereinafter "Kirtz") from an order refusing to revoke an order appointing Phillip Bardos receiver pendente lite for Med-Science Electronics, Inc. (hereinafter "the corporation"). No. 54362 is an appeal by Kirtz from an order canceling and voiding the issuance to him of two certificates of the capital stock of the corporation totaling 22,840 shares and declaring the ownership of one of them, a certificate for 14,840 shares, to be vested in plaintiffs Norbert W. and Frances F. Burlis (hereinafter "Burlis"). We have appellate jurisdiction because the amount in dispute exceeds the sum of $15,000.

There is a preliminary question common to both appeals, whether the trial court lacked jurisdiction of the subject matter for failure of the petition, in its original form and as amended, to state a cause of action. Specifically, Kirtz contends that plaintiffs, six shareholders of the corporation claiming to hold a majority of the voting shares, have no legal capacity to sue individually on their own behalf alone; that plaintiffs are claiming that *the corpor-* *ation* has been wronged and are attempting secondarily to enforce a right on behalf of the corporation in the interest of and for the benefit of' all of the shareholders and not for plaintiffs' sole benefit and interest; that in such an effort plaintiffs were obliged to bring a derivative action under Civil Rule 52.08, V.A.M.R. for the benefit of the corporation, and consequently are asserting a claim for relief unknown to the law under the rules laid down in Schick v. Riemer, Mo.App., 263 S.W.2d 51; Caldwell v. Eubanks, 326 Mo. 185, 30 S.W.2d 976, 72 A.L.R. 621, Saigh ex rel. Anheuser-Busch, Inc. v. Busch, Mo.App., 396 S.W.2d 9; Bailey v. State Farmers Mutual Casualty Co., Mo.App., 377 S.W.2d 485, and Eckelkamp v. Diamonds, Incorporated, Mo.App., 432 S.W.2d 360.

Looking to the original petition, the six shareholders sued several other shareholders, including Kirtz. The corporation was named as a party defendant. Plaintiffs alleged that defendants Kirtz and Morton Schwartz instigated a purported meeting of the shareholders at which defendants Kirtz, Stegeman and Schwartz were allegedly elected directors; that these three unlawfully purported to hold a meeting of the board of directors at which Burlis was summarily ousted as president; unlawfully usurped the offices of director, president, etc.; appropriated the conduct of the business; trespassed upon and occupied the physical premises to the exclusion of plaintiffs; refused to permit plaintiffs to inspect the corporate books and records; prevented plaintiffs from calling or providing notice of a special meeting of the stockholders to legally conduct the affairs and business of the corporation and have continually breached their fiduciary duties to the shareholders. Plaintiffs prayed for injunctive relief against these usurpations; for an order preventing consummation by defendants of a proposed settlement of a suit against the corporation by Mid-States Business Capital Corporation, and granting them access to the corporate books and records for the purpose of inspection.

■ Not every allegation of wrongdoing in the original petition is a Simon-pure charge of individual injury. Some of the language is appropriate to a derivative action for the corporation. The *gravamen* of the pleading, however, is injury to plaintiffs *as individuals*. Most of the grievances and the principal complaints relate to wrongs redounding to the detriment and direct injury of plaintiffs as individuals. Actions based upon torts where the injury is done directly to an individual shareholder, director or officer as such, depriving him of his rights, for instance, wrongfully expelling him or refusing to allow him to inspect the corporate books and records, are actions which may be brought by shareholders as individuals, 13 Fletcher, Cyclopedia of Corporations, Perm. Ed., §§ 5911, 5915, and are not required to be brought as derivative actions.

After the petition was filed and a temporary restraining order issued the parties agreed to the entry of a consent order authorizing plaintiffs to inspect the corporate books and records. Inspection disclosed that Burlis' certificates of stock for 14,840 shares had been cancelled; that a certificate for that number of shares had been issued to a lawyer associate of Kirtz; that this certificate had been cancelled and a certificate for 14,840 shares then issued to Kirtz; that another certificate of stock had been issued to Kirtz for 8,000 shares. Armed with this information plaintiffs filed an amendment to the original petition charging that defendants Kirtz, Schwartz and Stegeman fraudulently converted the 14,840 shares belonging to Burlis and wrongfully issued these shares to Kirtz, and illegally issued the additional 8,000 shares to Kirtz. Plaintiffs prayed for cancellation of these certificates and reissuance of 14,840 shares in Burlis' name.

■ The amendment did not convert the claim into a derivative action which had to be maintained for and on behalf of the corporation. Stockholders may maintain an action on an individual basis, as distinguished from a derivative action, against directors, officers, or others for the redress of wrongs constituting a direct fraud upon them, as in the case where wrongdoers by fraud have seized control of the corporation from the complaining stockholders. 19 Am.Jur.2d Corporations § 535, p. 73. The charges that defendants fraudulently deprived Burlis of 14,840 shares of stock allege acts which affected Burlis directly and individually, and not the corporation. The outstanding stock of a corporation is the individual property of the shareholders. It is not the corporation's property and the corporation, as such, has no interest in it or in dealings among shareholders with respect to their stock. Yax v. Dit-Mco, Inc., Mo.Sup., 366 S.W.2d 363, 367 [4]. It was not necessary for Burlis to sue in behalf of the corporation to recover stock owned solely by Burlis. For this injury to personal rights Burlis had the right to maintain an individual action for redress. Willcox v. Harriman Securities Corp, D.C.N.Y., 10 F.Supp. 532; Witherbee v. Bowles, 201 N.Y. 427, 95 N. E. 27; Vierling v. Baxter, 293 Pa. 52, 141 A. 728. Another rule aids Burlis, namely, that which gives to a stockholder to whom an erring director or officer owes a special fiduciary duty the right to maintain an individual action. 19 Am.Jur.2d Corporations § 536. Kirtz, who as Burlis' longtime friend, adviser and attorney, occupied a position of special trust and confidence in advising Burlis with respect to the protection of his interest in the 14,840 shares, was subject to be sued individually by Burlis for breach of the special fiduciary obligation.

■ Less clear is whether an action challenging the transfer of 8,000 shares of unissued shares from the corporate treasury is the type of action which can be maintained by individual shareholders. Ordinarily an action based on acts relating to the capital stock as an entirety is a corporate cause of action and cannot be sued for by a shareholder merely as an individual. "However, if the acts complained of,

although relating to the stock as a whole, work an injury to rights belonging to the stockholders individually as between them and the corporation and its other stockholders, as where an unlawful increase of stock ousts the complaining stockholders from their position as controlling shareholders, the action is individual and not derivative." 13 Fletcher, Cyclopedia of Corporations, Perm.Ed. § 5915, pp. 384, 385. The addition of a total of 22,840 shares to the previous shareholdings of Kirtz made him the holder of a majority of the voting shares and deprived plaintiffs of their position as controlling stockholders.

■ Accordingly, the cause of action, viewed in its entirety, was individual and not derivative; the petition stated a cause of action, and the circuit court had jurisdiction to entertain the action.

### Case No. 54362

On conflicting testimony we find these facts: Norbert W. Burlis, Val T. Effinger and Frank G. Kirtz formed the corporation in 1955 for the purpose of designing and manufacturing medical equipment. For his legal services in the incorporation Kirtz was given 500 shares of stock. Kirtz was elected director and secretary. Burlis was issued 4500 shares; Effinger 5900. As the business expanded the capital stock was increased. In 1961 the articles were amended to fix the number of common shares at 112,158 at $1 par each; to change the name of the corporation; to increase the directors from three in number to four; to enlarge the corporate purposes and to waive preemptive rights. These amendments were made pursuant to the requirements of a purchase agreement entered into with Mid-States Business Capital Corporation, which loaned the corporation approximately $110,000 as working capital. The loan was evidenced by debentures with stock purchase warrants attached, authorizing Mid-States to purchase 28,040 shares of stock of corporation. The purchase agreement and warrants required the corporation at all times to reserve and keep available, out of its authorized and unissued capital stock, a sufficient number of shares to provide for the exercise of the warrants then outstanding and in effect. Corporate resolutions of record recited that any restrictions imposed upon the corporation by the purchase agreement would be strictly observed. A corporate resolution also prohibited Kirtz from receiving any compensation in any form for legal services in addition to his salary.

In addition to the $110,000 borrowed from Mid-States the corporation borrowed about $70,000 from Boatmens National Bank. These obligations were not discharged when due. Lawsuits were filed for their collection. When the time came for the annual renewal of the corporate registration and antitrust affidavit required by §§ 351.120 and 416.200, RSMo 1959, V. A.M.S., respectively, Kirtz advised the other directors not to file it "in order to make the litigation with Mid-States more defensible." Asked by Burlis what effect this would have on the corporation Kirtz answered "No practical effect"; that the corporation would cease to exist as a corporation but it could be reinstated at any time by paying $15 or $20. As a result the corporate charter was forfeited on January 1, 1966. At the time of the forfeiture the directors were Burlis, Kirtz, Stegeman, and one Harry A. Collinger. Burlis was president, Kirtz was vice-president and secretary and Stegeman was treasurer. A meeting of the shareholders was held on March 7, 1966. This was after the charter was forfeited and before the forfeiture was rescinded. Kirtz advised Burlis to absent himself from the meeting, which he did on Kirtz' representation that it would benefit the corporation in its struggles with its creditors. At that meeting Burlis, Kirtz, Stegeman and Schwartz were elected directors. On May 31, 1966 Burlis, returning from a business trip to the west coast, was met at the train station by Kirtz, Stegeman and Schwartz. The four men left the station in an automobile.

While driving through the streets Kirtz told Burlis that things were in a mess; that it had been necessary to bring in an accountant to act as president; that Stegeman had been elected president and that they would accept Burlis' resignation. Burlis asked if this was a joke. Kirtz said that if Burlis was going to argue about it they would have a directors' meeting "right now" and elect officers. Without any prior notice and while in the automobile Kirtz nominated Stegeman for president; Schwartz seconded the nomination, and Kirtz, Stegeman and Schwartz voted in favor. No other officers were elected at the purported board meeting of May 31, 1966. Burlis, who did not then or thereafter resign as president, was told that he did not have to return to the office; that he would be driven to his home; that he would be given a final check for 2 weeks' services and his personal effects from his desk returned to him later that day at a certain intersection provided he turn in his credit cards and some microfilm copies of blueprints in his possession. Burlis appeared at Ladue and Lindbergh Boulevards at the designated time, at which time the exchange was made. The check delivered to Burlis was marked "Termination pay." At that time Burlis asked Kirtz about his personal note due Kirtz; whether he wanted him to pay it, and Kirtz answered, "No, don't worry about that; we'll get to that later on; there is no need to worry about that now." In June, 1966 Kirtz designated Schwartz to act as secretary of the corporation.

Previously Burlis had borrowed money several times at Boatmens National Bank for personal reasons not connected with the business of the corporation. On December 1, 1965 a personal note for $10,500 came due. As security for this loan Boatmens held five certificates of stock of the corporation owned by Burlis. The five certificates totaled 14,840 shares. Boatmens demanded payment of the note. Not having readily available funds with which to pay, Burlis asked Kirtz "what to do." Kirtz was the financial officer of the corporation and Burlis had confidence in him, trusted him and relied upon him as a friend. Burlis could have borrowed the money from another bank to pay Boatmens. Concerned about the possibility that Boatmens might sell the collateral Burlis talked with Kirtz several times. Kirtz constantly reassured Burlis that Boatmens would not sell the stock, representing to him that "it was worthless, nobody would buy it, [he] shouldn't worry about it." Kirtz advised Burlis to "do nothing because it would jeopardize our position in the lawsuit that the company was engaged in"; that it would indicate to Boatmens that Burlis felt that the stock was valuable and make Boatmens press harder for judgment against the corporation; that if Burlis ignored the demand for payment it would indicate to Boatmens that Burlis "didn't care about the stock." Boatmens then sued Burlis on the note. While Burlis was out of town attending a convention Boatmens announced a pledgee's sale of the stock. In a long distance telephone conversation Kirtz informed Burlis of the notice of the pledgee's sale but advised Burlis not to worry about it; stating that Kirtz and Schwartz had talked to the attorneys for Boatmens and had negotiated a settlement whereby Boatmens would be paid by Kirtz, who would lend Burlis $10,000; that "all of the details would be taken care of" and that all Burlis would have to do on his return would be to sign papers which Kirtz and Schwartz would prepare; that the suit against Burlis would be dismissed with prejudice, and that Burlis would "not even have to pay attorney's fees," only interest and costs. Kirtz told Burlis "This way you won't have to worry about anything." When Burlis returned Kirtz and Schwartz presented for signature a letter to the bank authorizing the transfer of possession of the 14,840 shares to Kirtz and a promissory note for $10,000 payable to Kirtz. The note recited that presentment for payment, demand, protest and notice of dishonor were waived by all parties. When Burlis asked about these provisions Kirtz told

Burlis that it "didn't mean anything special"; that the attorneys merely copied the form of the Boatmens note. The note, dated April 18, 1966, was payable "Anytime after date." When Burlis asked Kirtz how he wanted him to pay the note, whether by monthly payments, Kirtz told Burlis "not to worry about that"; that it was not important; that they would "take care of that after we settle all of these lawsuits and get out of the problems." This referred to the litigation in which Mid-States and Boatmens were pressing their claims for repayment of loans made to the corporation. Kirtz asked of Burlis only that he pay the 6% interest when it would come due a year later. Burlis signed the letter to the bank, the promissory note payable to Kirtz, and five stock powers in blank authorizing transfer of the five certificates of stock. Kirtz paid Burlis' note at the bank and on the basis of the letter received into his possession the five certificates for 14,840 shares. At no time thereafter did Kirtz, personally or by attorney or agent, make any demand, oral or written, on Burlis for payment of the note or any part of the note. Nor did Kirtz at any time thereafter notify Burlis of any impending sale or other disposition of the 14,840 shares held by him as collateral.

On June 8, 1966, unbeknownst to Burlis, the five certificates totaling 14,840 shares of stock in Burlis' name on the books of the corporation were replaced by Certificate No. 94 for 14,840 shares issued to one Robert A. Thomann, an attorney occupying law offices at the same address as those of Kirtz.

On July 1, 1966 Kirtz and Schwartz applied to the secretary of state for rescission of the forfeiture, and on July 5, 1966 the forfeiture was rescinded.

On August 6, 1966 Burlis wrote Stegeman informing that his holding of any office other than treasurer was illegal and demanding access to the books and records of the corporation on the afternoon of August 8. At the latter time Burlis and stockhold-er Effinger were denied access to premises of the corporation. Prior thereto they were advised by Kirtz that if Burlis or other stockholders sought information from the books and records they would be "discovered to have been lost or misplaced."

On the morning of August 9, 1966 Burlis, Gieselmann and their attorney sought admission to the premises of the corporation to obtain access to the corporate records and books and for Burlis to exercise his duties as president. They were physically prevented from gaining admission. Later on August 9 stockholders Gieselmann, Effinger and four others named Burlis filed their petition in circuit court. A circuit judge promptly issued an ex parte order, reciting that it was to be effective upon receipt of actual notice thereof, temporarily restraining Kirtz, Stegeman, Schwartz and the other defendants from settling the litigation between Mid-States and the corporation; from acquiring any stock in the corporation by exercising stock purchase warrant rights; from refusing stockholders' rights of inspection of the corporate books and records; from barring them from the corporate premises; from usurping the positions as alleged officers and directors of the corporation not held by them prior to January 1, 1966 and from breaching their fiduciary obligations, either as principal or agent, officer or director or otherwise to plaintiffs as shareholders of the corporation. This order was served upon defendant Schwartz on the evening of the same day it was issued, August 9. Schwartz immediately notified Stegeman and the two men went to the residence of Kirtz, arriving there at 11:00 p.m. After all three had read the petition and order they went to the basement of Kirtz' home, where Kirtz maintained an office with a typewriter. During the last hour of August 9 or the first hour of August 10 the three men, Kirtz, Stegeman and Schwartz, there purported to hold a meeting of the board of directors. At Kirtz' direction two certifi-

cates of stock were issued in the name of Kirtz. Certificate No. 96 for 14,840 shares was issued in lieu of Certificate No. 94. Certificate No. 95 for 8,000 shares was issued for a recited consideration of $800 cash and "other valuable considerations," namely, alleged legal services rendered by Kirtz beyond his duties as an officer of the corporation, agreed by Kirtz and Schwartz to be worth $7,200. Kirtz wrote his personal check for $800. Certificates Nos. 95 and 96 were filled out by Kirtz, presented to and signed by Stegeman and Schwartz, as president and secretary, respectively, and delivered into the hands of Kirtz. Upon receiving Certificates Nos. 95 and 96 Kirtz, who previously held 22,500 shares, stated, "I now own over 50% of the voting stock of the corporation." The stock books showed that as of August 7, 1966 there were 82,468 shares issued and outstanding. As of that date the previously issued stock purchase warrant for 28,040 shares was outstanding and unexercised. Therefore 1,650 shares of stock were available for issue without restriction at the time Certificate No. 95 was issued. Kirtz and Schwartz collaborated in the preparation of the minutes of the purported meeting of the board of directors conducted in the late hours of August 9 or the early hours of August 10, 1966. Kirtz personally typed the minutes purporting to authorize the issuance of the stock certificates, had knowledge of the terms of the court order and knew the proper date. Nevertheless he intentionally falsely recited in the minutes that the meeting occurred on August 3, 1966 and that it was called for 10:00 a.m. The certificates, also prepared personally by Kirtz, were falsely predated August 8 and this also was done by Kirtz knowingly and intentionally. After midnight, early on the morning of August 10, the three men, Kirtz, Stegeman and Schwartz, proceeded from Kirtz' home by automobile to the corporate offices. There a deposit slip for $800 check was prepared. The three then proceeded to the bank where the corporation had a bank account and at 1:00 a.m. on August 10, 1966

Kirtz placed the $800 check in the night depository to the account of the corporation.

On August 19, 1966 Burlis offered Kirtz a personal check for $10,200 in payment of the promissory note, a sum sufficient to cover principal and interest for four months. Written on the check was this notation: "for payment of $10,000 note and interest and return of collateral of 14,840 shares of Med-Science Electronics stock." Kirtz said "I cannot accept it." On September 29, 1967 Burlis paid into the registry of the court $10,871.24 in the form of two money orders one for $10,200, the other for the balance of any interest the court might find due as of the date of the tender into court.

The judgment of the circuit court cancelling and invalidating Certificates Nos. 95 and 96 must be affirmed. The charter of the corporation was forfeited on January 1, 1966. This effected a dissolution of the corporation, Bruun v. Katz Drug Co., 351 Mo. 731, 173 S.W.2d 906, ended its existence, and destroyed its every faculty, including the capacity to hold meetings of the stockholders or of the board of directors. Leibson v. Henry, 356 Mo. 953, 204 S.W.2d 310; State ex rel. McDowell v. Libby, 238 Mo.App. 36, 175 S.W.2d 171; Arnold v. Streck, 7 Cir., 108 F.2d 387; Bradley v. Reppell, 133 Mo. 545, 32 S.W. 645, aff. 133 Mo. 545, 34 S.W. 841; Butler v. Beach, 82 Conn. 417, 74 A. 748. The meeting of the shareholders on March 7, 1966 and the election of Schwartz as a director at that meeting were nullities. The so-called directors' meeting of May 31, 1966 at which time Stegeman was purportedly elected president was illegal. So also was the designation of Schwartz as secretary in June, 1966. The rescinding of the forfeiture did not validate these illegal meetings and elections. Clark Estate Co. v. Gentry, 362 Mo. 80, 240 S.W.2d 124; New Hampshire Fire Ins. Co. v. Virgil & Frank's Locker Serv., 8 Cir., 302 F.2d 780; Leibson v. Henry, supra; Butler v. Beach, supra. The so-

called meeting of the board of directors on the night of August 9, 1966 was illegal. No notice of the meeting was given. No quorum was present. The lawful directors on that date were those in office prior to the forfeiture of the charter, namely, Burlis, Collinger, Kirtz and Stegeman. Burlis and Collinger were not present. Kirtz could not vote or help constitute a quorum in considering a matter in which he had a personal interest. Christy v. Laclede-Christy Clay Products Co., Mo.App., 253 S.W. 106; Hill v. Rich Hill Coal Mining Co., 119 Mo. 9, 24 S.W. 223. Accordingly, there was only one director present lawfully entitled to vote at lawful meetings of the board. Every act of Stegeman as president and of Schwartz as secretary was a usurpation. Their acts as directors and as president and secretary, respectively, at the nocturnal meeting were not only usurpations but were intentionally and knowingly performed in violation of the previously entered court order of August 9 enjoining them from usurping positions as alleged officers and directors not occupied by them prior to January 1, 1966. The pretended corporate minutes predated August 3, 1966 and Certificates Nos. 95 and 96 signed by the spurious officers were conceived and executed in fraud and are null and void.

 The issuance of Certificate No. 95 for 8,000 shares violated the provisions of the stock purchase warrant and the resolution of the board of directors requiring that a sufficient number of unissued shares be reserved and kept available for issuance under the stock purchase agreement. The 82,468 shares issued, plus the 28,040 shares which were required to be kept in reserve, totaled 110,508 shares, leaving only 1,650 shares of the 112,158 shares of authorized capital stock available for issuance. The certificate for 8,000 shares exceeded the available shares by 6,350. Furthermore, there was no consideration for $7,200 of the $8,000 allegedly paid for the stock. By resolution of the shareholders in 1961, a provision of the purchase agreement, and a resolution of the board of directors on

April 28, 1961 never revoked, Kirtz was prohibited from receiving any compensation in any form for legal services in addition to his salary. Finally, Kirtz violated his fiduciary duty to the shareholders. A director of a corporation occupies a position of the highest trust and confidence and the utmost good faith is required of him in the exercise of the powers conferred upon him. Hill v. Rich Hill Coal Mining Co., supra. He may not deal with the property of the corporation for his own personal benefit or advantage, Yax v. Dit-Mco, Inc., Mo.Sup., 366 S.W.2d 363; profit at the expense of the shareholders, Ramacciotti v. Joe Simpkins, Inc., Mo.Sup., 427 S.W.2d 425, or cause the issuance of stock for his own personal aggrandizement to the detriment of other shareholders or for the purpose of obtaining control of the corporation. 19 Am.Jur.2d Corporations § 1327. Johnson v. Duensing, Mo.Sup., 351 S.W.2d 27, holds that the sale of treasury stock by the directors of a corporation effecting corporate control in a certain group, without notifying the shareholders and without obtaining the best available price for the stock, is a breach of fiduciary duty which may be rescinded, even as to purchasers who were not officers, directors or shareholders. A fortiori the sale to an officer and director, under the bizarre circumstances of this case, constituted a breach of fiduciary duty.

 Special considerations apply to Certificate No. 96 for 14,840 shares. In addition to the fact that it was illegal and void for the reason that it was fraudulently issued for the predetermined and obvious purpose of vesting in Kirtz control of the majority of the voting stock, there is the further factor of fraud in the procurement. Taking advantage of the confidence and trust reposed in him by Burlis, who leaned upon him for legal advice in connection with his private business affairs, Kirtz persuaded Burlis not to pay the debt due Boatmens on the basis of a weakly contrived reason and after the bank sought to redeem the collateral gave him

assurances not to worry about the sale; persuaded Burlis to permit him to slip into the shoes of the bank; contrived to obtain Burlis' signature to a note prepared in such a manner as to provide for waiver of presentment, demand, etc.; gained possession of the collateral and obtained stock powers in blank to facilitate the transfer of the stock and then, without making any demand upon Burlis for payment and without notifying him of his intended disposition of the collateral, appropriated it to his own uses and purposes. Kirtz falsely represented to Burlis that the waiver provisions in the note were of no importance and that he would not have to worry about payment of the note until after the litigation was settled. These were representations of material, existing facts upon which Burlis had a right to and did rely to his damage. They were false and Kirtz knew that they were false. The fraud perpetrated on Burlis in securing possession of the collateral was compounded by his fraud in preparing false entries in the minute books; in procuring Stegeman and Schwartz (who obviously were dominated by and the instrumentalities of Kirtz) to join in the issuance to Kirtz of Certificate No. 96; by misdating the corporate minutes and certificates, and in procuring the certificate in violation of the order of the court.

The court's rulings were consistent with the provisions of the Uniform Commercial Code. Section 400.8–315(1) [1] preserves to any person against whom a transfer of a security is wrongful the right to be made whole, except bona fide purchasers. Kirtz failed to meet the burden of proving that either he or Robert Thomann was a bona fide purchaser. Section 400.9–504(3), providing for the disposition of the collateral by a secured party after default, requires that "reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made" be sent by the secured party

to the debtor, unless the collateral is "perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market." Kirtz did not bring this case within any of the exceptions. He was obliged to but did not notify Burlis of his intended disposition of the collateral. If as Kirtz contends the note was a demand note, he failed to establish that any demand was made.

There was no error in admitting parol evidence to explain the circumstances relating to the time of payment of the $10,000 note. Fraud having been shown in the procurement of the note, parol evidence was admissible to explain the circumstances of the fraud. Feigenbaum v. Bockrath, Mo.App., 191 S.W.2d 999, 1003.

The tender of $10,200 in the form of a check was sufficient. Kirtz did not refuse to accept it on the ground that it was not in the form of a check. He gave no reason or ground for his refusal. The grounds of an objection by a creditor to a tender must be specified, otherwise it is waived. Capital City Motors, Inc. v. Thomas W. Garland, Inc., Mo.Sup., 363 S.W.2d 575, 579.

The judgment of the circuit court in Case No. 54362 canceling and voiding Certificates Nos. 95 and 96; declaring the 14,840 shares to be vested in and owned by Burlis; directing the clerk to pay Kirtz $10,200 for the Burlis note; canceling the latter as fully paid, and ordering the balance paid to Burlis, was correct in all things and is affirmed.

### Case No. 54361

This is an appeal from an order refusing to vacate the order of July 17, 1967 appointing Phillip Bardos receiver pendente lite for the corporation. On September 27, 1967 Kirtz filed a motion to vacate the order of appointment and to require his surety, The American Insurance Company, to restore to the corporation all monies he

1. All section references are to RSMo 1959, V.A.M.S.

had expended and had been paid for services. The motion alleged that Bardos' appointment was illegal because he was not a resident of. the State of Missouri; that he was clandestinely nominated by plaintiffs and their attorneys without the knowledge and approval of Kirtz and arbitrarily appointed without giving Kirtz permission to interrogate Bardos as to his qualifications; that Bardos has dissipated the corporation's funds by frequent and costly trips to his residence in California and by other unnecessary expenses, including $850 for a cocktail party, repeated audits of the corporate books and by using assets, monies and facilities of the corporation for his personal interest, and that Bardos jeopardized the reputation of the business by disseminating information detrimental to the corporation. The prayer was for revocation of the appointment and to require Bardos to account to the corporation for "all illegal actions and expenditures at his cost, and of the surety." (The surety was not made a party to these proceedings.)

After hearing the court overruled the motion and this separate appeal followed. After submission of the case on appeal and on May 26, 1969 there was filed in this court a certified copy of an order of the circuit court in this case relieving Bardos of his duties, responsibilities and authority as receiver and in his stead appointing one Malcolm S. Morrison as receiver.

▪ By reason of the fact that Bardos no longer holds the office of receiver questions concerning his qualifications to act as such and of the regularity of his appointment are moot. The issues relating to alleged dissipation of corporate funds and his liability to repay sums to the corporation, however, are not moot, Antoine v. McCaffery, Mo.App., 335 S.W.2d 474, 479 [3], and we will examine the record to determine the propriety of the order of the circuit court with respect thereto.

▪ Kirtz failed to substantiate the charge that Bardos made frequent and costly trips to his residence in California

at the expense of the corporation. The evidence was that he made seven out-of-town trips, six on company business and one for personal reasons, and that he personally paid for his personal trip.

Kirtz showed that Bardos approved the expenditure of $850 for a cocktail party at Houston, Texas in November, 1967, but the receiver reported that fact to the court and it was not shown that the expenditure was not a legitimate expense of convention entertainment and advertising or that it did not enure to the benefit of the corporation. There was evidence that highly detailed auditing and accounting work was necessary and that "large sums" were expended for this purpose. The work was done by a nationally known firm of accountants after conferences with the circuit judge with respect to the accounting problems, and there was no evidence that the audits were unnecessary or that the amounts spent for audits were excessive. A bookkeeper and office manager testified that Bardos wrote letters and prepared bulletins for distribution relating to the affairs of the American Association for the Advancement of Medical Instruments, with which Bardos was associated, but there was no evidence as to the cost or that the corporation was not reimbursed. There was evidence that the contacts Bardos made in that association were indirectly beneficial and helpful in promoting the business of the corporation. Bardos denied making personal telephone calls and charging them to the corporation. There was no evidence that Bardos jeopardized the reputation of the business. It was shown that he signed his name as "President" of the corporation in company correspondence; that on one occasion he indicated to a potential overseas distributor that he was acting as receiver pendente lite, and had advised four doubtful accounts that he had been appointed by the court. There was nothing to show that any of these things adversely affected the corporation from a financial standpoint.

In sum, there is no evidence in this record from which the court would have

been justified in requiring Bardos to repay the corporation any sum of money, and the order overruling the motion to vacate and to require restoration of monies is affirmed.

SEILER, P. J., STORCKMAN, J., and HENLEY, Alt. J., concur.

HOLMAN, J., not sitting when cause was submitted.