483 F.Supp. 148 (1980)
Frank Groom KIRTZ and Mary Jane Kirtz, Plaintiffs,
v.
Blanton WIGGIN, Erma Wiggin et al., Defendants.
No. 76-481C(B).
United States District Court, E. D. Missouri, E. D.
January 15, 1980.
*149 Joseph L. Badaracco, St. Louis, Mo., for plaintiffs.
Edward Weakley, Mark Mittleman, St. Louis, Mo., for defendants.

MEMORANDUM
REGAN, District Judge.
In this action pending since May 26, 1976, defendants have moved to dismiss plaintiffs' fourth amended complaint for failure to state a claim and for summary judgment.
In an earlier stage of this case we dismissed plaintiffs' second amended complaint on various procedural grounds. In an unpublished opinion in Kirtz v. Wiggin, 566 F.2d 1179 (8 Cir. 1977), the Court of Appeals reversed in part and affirmed in part, expressly disclaiming any attempt to consider the substantive sufficiency of the allegations of the complaint, although noting that plaintiffs' claims, "as articulated in their complaint, rest precariously on the outer fringes of cognizable legal theories." The complaint we dismissed contained thirteen claims. The present complaint contains sixteen.
Quoting from the Court of Appeals opinion: "The Kirtzes, residents of Missouri, were the sole minority stockholders of Med-Science Electronics, Inc., a Missouri corporation, until August 1973, when that company was merged into Advance(d) Instruments, Inc., a Massachusetts corporation. Blanton and Erma Wiggin, residents of Massachusetts, controlled the majority of the stock of both companies and were the directors and officers of Med-Science. The Kirtzes allege that the Wiggins, through various self-dealing transactions and improper accounting devices, diverted corporate funds and fraudulently reduced the book value of Med-Science so that Advanced Instruments could purchase the company at less than its true worth." As noted by the Court, the present suit "is one in a long line of legal disputes arising from the Kirtzes' relationship with Med-Science." Two of these cases "culminated in the disbarment of Kirtz by the Supreme Court of Missouri."
Plaintiffs, who objected to the merger prior to the meeting of the stockholders of Med-Science and made a written demand for payment of the "full value" of their shares, thereafter filed suit in the Circuit Court of the City of St. Louis under Section 351.455 RSMo., seeking judgment for such amount as the court should determine to be the "full value" of their shares as of the day prior to the date the vote on merger was taken, together with interest thereon to date of judgment. Following a full-scale *150 trial of that action,[1] judgment was entered awarding plaintiffs $62,100 as the "full value" of their minority Med-Science stock, and interest of $13,424. Plaintiffs were ordered to deposit with the court an assignment of their stock to be delivered upon the payment by defendants of the sums awarded. The state court judge found that the Med-Science stock had a value of $2.76 per share. On plaintiffs' appeal the judgment was affirmed. Kirtz v. Advanced Instruments, Inc., Mo.App.1979, 581 S.W.2d 868. The record in that case, containing the trial transcript, is before us on the motion for summary judgment.
In our consideration of the sufficiency of the fourth amended complaint and the evidence relating thereto, we start from the premise that the Missouri Supreme Court's finding[2] that "Kirtz had been guilty of gross, reprehensible fraud in performing certain alleged acts in seeking to obtain control of Med-Science and in converting certain shares of stock belong to (Burlis)" in no way affects or precludes plaintiffs' ability to recover for any later fraud which may have been perpetrated on them by the Wiggins.
Count I of the present complaint alleges that (at some unspecified time prior to the merger) $140,443 of Med-Science funds was paid to Advanced Instruments, Inc. (a corporation wholly owned by the Wiggins) as commissions for the sale of Med-Science products pursuant to a contract appointing Advanced Instruments as exclusive sales agent; that plaintiffs were unaware of the relationship between the two corporations until 1975;[3] and that as a result of the payments of the sales commissions, the value of plaintiffs' 28% stock holding was diluted to the extent of 28% of the payments, for which amount, together with $50,000 punitive damages judgment is sought. In effect, Count I attempts to state a claim for breach of the Wiggins' fiduciary relationship based on the charge that for practical purposes they were dealing with themselves. Parenthetically, we note that there is no claim that the sales commissions were not in fact earned nor that they were excessive. Assuming, however, that the Wiggins' conduct resulted in a wrongful depletion of corporate assets, it is clear that plaintiffs would have no individual or personal, as distinguished from a derivative, claim with respect thereto.
The situation here presented is wholly unlike that in Gieselman v. Stegeman, supra, where the wrongs committed by Kirtz resulted in a direct injury to the plaintiffs therein. As the Missouri Supreme Court stated (443 S.W.2d at 131): "Stockholders may maintain an action on an individual basis, as distinguished from a derivative action, against directors, officers, or others for the redress of wrongs constituting a direct fraud upon them, as in the case where wrongdoers by fraud have seized control of the corporation from the complaining corporation . . . Another rule . . . gives to a stockholder to whom an erring director or officer owes a special fiduciary duty the right to maintain an individual action."
In Gieselman, Kirtz, as Burlis' longtime friend, adviser and attorney, occupied a position of special trust and confidence in advising him with respect to the protection of his stockholdings. Burlis sought to recover from Kirtz the stock he owned of which Kirtz had fraudulently deprived him. In the present case, there is no allegation nor contention that the Wiggins seized control of Med-Science from plaintiffs, nor could there be, since such control was already in the Wiggins. So, too, the Wiggins and the Kirtzes dealt at arms length with *151 each other, so that the Wiggins owed the Kirtzes no fiduciary duty other than that they would have owed to any minority stockholder. In contrast to Gieselman, the Wiggins did not occupy a position of special trust and confidence.
Of course, any breach of the fiduciary duty owed by an officer and controlling stockholder to the corporation could adversely affect the value of the stock owned by the other stockholders. However, if by reason of self-dealing, the Wiggins wrongfully diverted corporate assets to themselves, the wrong was to the corporation and not to plaintiffs individually.[4] And inasmuch as the alleged "wrong" was known to plaintiffs prior to the trial and determination of the value of the minority stock,[5] they had the right and obligation to present the evidence relating thereto in the state valuation case if they believed it would serve to enhance the value of their stock. This for the obvious reason that the amount of the allegedly diverted assets for which the Wiggins are claimed to be liable would have been an asset of the corporation to be considered and taken into account in ascertaining the value of the plaintiffs' stock. In this situation plaintiffs are precluded from again litigating the issue of valuation under the guise of "fraud." They had their day in court and the opportunity to present whatever evidence they deemed necessary which would tend to enhance the value of the corporate assets and so of their stock holdings.
It appears to be plaintiffs' theory that by charging, as they now do,[6] that the actions of the Wiggins constitute "deceptive or manipulative devices" within the purview of Section 10(b) of the Securities Exchange Act of 1934 (Section 78j(b), 15 U.S.C. and Rule 10b(5) of the Securities Exchange Commission) they will not be subject to the defense of collateral estoppel or res judicata. Be that as it may (and we do not rule that issue), the facts in this case come within the rationale of Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). Therein the Supreme Court held that a breach of corporate fiduciary duty involving fiduciary self-dealing was not within the purview of Section 10(b). Here, as in Santa Fe, the alleged conduct was not "manipulative" within the meaning of the statute. "The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." 430 U.S., at 476, 97 S.Ct., at 1302.
The mere fact, if so, that plaintiffs, as minority stockholders, had not theretofore been told nor were aware of the alleged self-dealing may not be equated with "deceptive practices" or "omissions" in the Section 10(b) sense. As in Santa Fe, present plaintiffs were afforded by Missouri law a forum in which (as of the time of the merger) they could recover the fair value of their shares unaffected by the alleged breach of fiduciary duty of which they then had knowledge, so that it is entirely appropriate in this instance to relegate (plaintiffs) to whatever remedy is created by state law. In Santa Fe, the minority stockholders wholly failed to pursue their state law remedy. Here, having utilized that remedy in which they recovered the full actual value of their stock, plaintiffs may not again litigate that issue (and certainly not for the purpose of again recovering their alleged loss) in a Section 10(b) setting.[7]
*152 Counts II through V, VII, VIII, X and XI, comparably to Count I, allege what plaintiffs perceive to be additional breaches of fiduciary duty and self-dealing on the part of defendants Wiggins. Each of these counts alleges a different act by the Wiggins which in plaintiffs' view operated to divert company assets to them and thereby reduce the book value of the plaintiffs' 28% interest in the corporate stock. Allegedly, in each instance, the facts relating to the alleged misconduct were not discovered by plaintiffs until 1975. We briefly summarize the essential allegations of these counts.
Count II, as amended, alleges without specifics that "note payable to shareholders" in the amount of $40,000 listed in the 1972 and 1973 balance sheets of Med-Science and which were signed by the Wiggins "were made upon fictitious transactions" and that the payment thereof constituted fraud which depleted the cash and net assets of the corporation and (to the extent of 28% of such payments) reduced the value of plaintiffs' stock.
Count III alleges, also without specifics, that the Wiggins "signed checks" for $40,000 "in unearned professional fees," further depleting the cash funds and net worth of Med-Science.
Count IV alleges that defendant Blanton Wiggin, at a shareholders' meeting in August, 1970, by virtue of his majority stock holding approved the purchase by Med-Science for $15,000.00 of 220 shares of H-T-L Instruments, Inc. "a defunct corporation in the State of Alabama," without disclosing his ownership of the defunct corporation, and that in 1973 those shares were written off as worthless.
Count V alleges that defendants listed on the July 16, 1973 balance sheet of Med-Science a fictitious account in the amount of $21,655 designated "Less allowance for doubtful accounts" sold by it, although there were no doubtful accounts sold by it, the sales having been made by Advanced Instruments (the sales agent owned by defendants), all for the purpose of lowering the cash funds and net worth of the corporation.
Count VII alleges that tax loss carryovers for the fiscal years 1972 and 1973 were appropriated by the Wiggins' defendants for the benefit of their wholly owned corporation, the facts as to which were discovered by plaintiffs in 1975. The count further alleges that the July 16, 1973 financial statement of Med-Science lists "accumulated depreciation" of property and equipment in the amount of $76,094 (the facts as to which plaintiffs discovered in 1974) and that the property and equipment (machinery and other manufacturing equipment) "are in existence and in use and have full resale value," so that plaintiffs' stock holdings were damaged.
Count X alleges that defendants (Wiggins) maintained for their personal and noncorporate use an automobile at their Massachusetts home during the years 1970, 1971, 1972 and 1973, the costs of which (some $20,000) were paid by Med-Science, although the company had no plant or customers at said location.
Count XI alleges that the "entertainment costs" of $27,000 shown on the 1973 financial statements of Med-Science were expended by the defendant Wiggins for their personal benefit and not for corporate purposes, and so constituted a diversion of corporate funds.
As with Count I, the alleged wrongs alleged in the foregoing counts were to the corporation and not to plaintiffs individually, even though as in every instance in which a corporation is defrauded or its assets diverted, there is (until remedied) an adverse effect upon each of the other stockholders. Our holding as to Count I applies equally to the foregoing counts.
We turn next to the remaining Counts VI, IX, XIII, XIV, XV and XVI. Count VI alleges that during 1973 and thereafter defendants Wiggins refused to supply plaintiffs' agents and attorneys copies of the corporate minutes and financial records of Med-Science, with the result that *153 plaintiffs have paid over $25,000 to a valuation company and to four law firms for their efforts to inspect the records and evaluate the fair market value of plaintiffs' holdings in the corporation. It is obvious that this count pertains to plaintiffs' alleged expenses and attorneys' fees incurred by them in their valuation case. The statute under which that action was brought (Section 351.455 RSMo.) makes no provision for payment of such items. And insofar as concerns the right of stockholders to inspect corporate books and records, Section 351.215 RSMo. governs. The sole remedy provided by that statute is the discretionary one of mandamus to obtain the records, together with a penalty of $250. State ex rel. Watkins v. Cassell, Mo.App.1956, 294 S.W.2d 647. Plaintiffs have not pursued that remedy nor could they do so in the present action, even ignoring the fact that the matter has long since been mooted. Hence, Count VI, seeking recovery of moneys allegedly expended to obtain the inspection of corporate records wholly fails to state a claim upon which relief can be granted in this action.
Count IX purports to allege a claim for abuse of process in suing out an execution and a writ of garnishment in aid thereof which in some unexplained manner resulted in plaintiffs losing legal interest on the sum held by the garnishee until it was discharged. The damages sought are the lost interest together with punitive damages.
Although plaintiffs allege in conclusionary language that the execution and the garnishment were "wrongful", no facts are alleged to warrant the use of that term. It is clear under Missouri cases that two of the essential elements of a claim for abuse of process are (1) that the process be employed to accomplish some unlawful end or to compel a party to do some collateral thing which is beyond the scope of the process and (2) an ulterior motive in such process. Barnard v. Barnard, Mo.App.1978, 568 S.W.2d 567, 571, pointing out that "(n)o cause of action arises where the process is employed to perform a function intended by law." There is an entire want of any factual allegations that at the time the execution and garnishment were sued out there was no outstanding unpaid judgment or which would show that the purpose of the execution and garnishment was an ulterior or collateral one other than to collect such a judgment. It may well be (as we surmise) that the state court ultimately held that the funds which were garnisheed were jointly owned and so not subject to a garnishment on a judgment against Frank Kirtz alone, but if so, that fact would not mean that defendants had no right to litigate the issue of the ownership of the funds.
Count XII complains of a "fraudulent" notation on the 1972 balance sheet of Med-Science and the re-assertion of such "fraud" in a defendants' exhibit offered in the valuation case. This matter pertains to the effect and validity of a sheriff's return to the effect that he had "seized and sold" 2,500 shares of Med-Science which then stood in the name of Frank Kirtz on the books of the company, although the certificates themselves had not been physically seized by the sheriff but remained at all times in the possession of plaintiffs.[8]
This precise issue was adjudicated in the valuation case, wherein the state court specifically held that under the evidence presented by the Kirtzes (which defendants were in no position to expressly refute), the certificate for 2,500 shares had been assigned on December 15, 1964 (the date of its issuance) to himself and his wife as joint tenants, so that (even though as of October 1, 1971, the date of the levy, the stock was still registered in Frank Kirtz' name alone) the levy was not legally effective to reach these 2,500 shares. On the basis of that finding, plaintiffs were awarded the full value of these 2,500 shares in addition to *154 the value of the other 20,000 shares held by them. Obviously, plaintiffs sustained no recoverable damages simply because the sheriff was found to have been in error in stating that the 2,500 shares had been "seized and sold" as the property of Frank Kirtz.
Count XIII appears to be an "umbrella" count complaining that during 1970, 1971, 1972 and 1973 while defendants Wiggins were practicing the "deceptive manipulative devices" alleged in Counts I, II, III, IV, V, VII, VIII, X and XI (which allegedly "deceptively" lowered the "apparent" income of Med-Science), they purchased stock of the company in over 20 transactions[9] and voted that stock for the merger for the purpose of "freezing out" the minority stockholder on a cash-out "book-value" basis less than the actual value of the stock. There is, of course, no contention that any of the over 20 stock purchase transactions of the Wiggins involved purchases from plaintiffs, so that they could not have sustained any legal injury. Insofar as plaintiffs are concerned, there was no bar whatever to the right of the Wiggins to purchase stock from whomever was willing to sell to them. And whatever may have been the purpose of the merger, plaintiffs made no attempt to prevent it or to set it aside, but instead utilized the provisions of Section 351.435 RSMo. to obtain a court appraisal of their stock. No claim for relief is stated in this Count.
Counts XIV and XV make serious allegations attacking the integrity of Herbert Bryant, an attorney of this bar, charging him with "oppression in office" and abuse of process while acting as Chairman of the Circuit Bar Committee of the Twenty-Second Judicial Circuit which filed the information in the Missouri Supreme Court seeking the disbarment of Frank Kirtz. Plaintiffs allege that Bryant was biased and prejudiced in his conduct of the "proceedings" which resulted in the decision of the Committee to institute the disbarment case in the Supreme Court. Included are allegations to the effect that Bryant, while also allegedly acting as attorney and agent for defendants, sought to purchase plaintiffs' shares at a low, extortionate, figure and that when the offer was rejected, the information was filed, with the result that Frank Kirtz suffered the destruction of his professional reputation and income by reason of his disbarment.
In an affidavit in support of the motion for summary judgment, Mr. Bryant explicitly states that he never acted as attorney or agent for any of the defendants. There is no evidence or showing to the contrary. Instead, plaintiffs make unverified charges that Mr. Bryant is guilty of perjury in so stating. Their contention is based solely on a letter written by Mr. Bryant on January 23, 1973, submitting to an attorney certain information which had been requested by plaintiffs' then (and present) counsel. In that letter, Mr. Bryant stated that at some time subsequent to the completion of the proceedings before the Committee in mid-July, 1973, he talked with Mrs. Kirtz to ascertain whether her husband was interested in selling his interest in the company, since a client of his was willing to purchase Wiggins' interest provided such client could also purchase Kirtz' minority interest. Clearly, nothing in this letter substantiates plaintiffs' charge that Mr. Bryant ever acted as attorney or agent for the Wiggins. The contrary is true.
Absent, as here, any relationship of attorney or agent on the part of Mr. Bryant to the Wiggins, nothing he may have done or not done could support a claim asserted by plaintiffs against defendants. Nevertheless, we believe fairness to Mr. Bryant requires that we point out certain facts of record as they appear in the opinion of the Missouri Supreme Court in the disbarment proceeding.
*155 Upon the filing of the information, the Court issued its citation to Kirtz which was served upon him notifying him to file a return within 30 days. No return having been filed, the Court then mailed by certified mail, a letter notifying Kirtz that unless he filed a return promptly, the case would be considered a default matter. The letter was returned "unclaimed" and nothing further was done by Kirtz. The opinion of the Court discloses that the usual practice then followed by the Court in disciplinary matters after a responsive pleading was filed was to appoint a special commissioner to hold a hearing, make findings of fact and report the same to the Court. However, in view of the refusal of Kirtz to file a responsive pleading, the Court proceeded with the case upon the information (which was practically a copy of the original charges of misconduct which had been served on Kirtz on February 10, 1972) and the record of the formal hearing held by the Committee. That record consisted essentially of the three volume transcript of the Gieselman trial and the opinion of the Supreme Court on appeal of that case, and other documentary evidence. The only live witness who testified before the Committee on the merits of the matter was Kirtz himself. He had also testified in the Gieselman trial. The deposition of a local attorney who had been involved (at Kirtz' instance) in the Med-Science matters and which was taken in the Gieselman case was also considered by the Supreme Court of Missouri. Instead of considering the proceeding purely as a default, the Court reviewed all the evidence anew and on the basis of such review came to the same conclusion as to the facts and the law as had been found in its earlier Gieselman opinion. Obviously, on this record, Kirtz' disbarment resulted from his own fraudulent conduct and not from any action on the part of Mr. Bryant. However, it is sufficient for present purposes that Mr. Bryant was at no time acting as attorney or agent for defendants. Summary judgment is appropriate on these Counts.
The remaining Count (XVI) constitutes a complaint that although, in accordance with the Missouri merger statute (Section 351.458), defendants had agreed to "promptly" pay the "fair value" of the Kirtz stock, they have failed to do so, even though on May 10, 1979, six days after the valuation decision had become final, demand for payment was made. Aside from the fact that plaintiffs have adequate means for collecting their judgment in the state courts, this claim did not come into existence until some three years after the present suit was filed and we deem it inadvisable to permit plaintiffs to attach to their existing complaint (without advising the Court of their intention to do so) a new claim of this nature.
It is, of course, true that ex parte leave was granted to file the fourth amended complaint. However, an amended complaint must relate to matters that occurred prior to the filing of the original complaint and operates to replace that complaint. If Count XVI is treated (for purposes of this ruling) as a supplemental pleading, it is clear that plaintiffs have not followed the applicable requirements of Rule 15(d) FRCP. That rule authorizes the Court, in its discretion, to permit a party to serve a supplemental pleading "upon reasonable notice [to the other party] and upon such terms as are just." No such notice was given, so that defendants had no opportunity to object to the filing of Count XVI as a supplemental pleading. And since we have found that plaintiffs are not entitled to recover under Counts I through XV, we deem it inadvisable to permit plaintiffs to litigate an entirely new claim in the original suit. This is particularly true where, as here, all that is necessary is for plaintiffs to execute on their Missouri judgment in the Missouri courts if the judgment has not been paid. Accordingly, we have concluded, in the exercise of our discretion, to strike Count XVI without prejudice.
It follows from the foregoing that judgment should be entered in favor of defendants and against plaintiffs on each of Counts I through XV and that Count XVI should be stricken without prejudice.
NOTES
[1] The present suit was filed shortly before the State Court action was tried.
[2] Gieselman v. Stegeman, Mo.1971, 470 S.W.2d 522, 523; Gieselman v. Stegeman, Mo.1969, 443 S.W.2d 127; In re Kirtz, Mo.1973, 494 S.W.2d 342.
[3] As filed, the date was alleged to be 1974. Following the filing of defendants' motions and memorandum in support thereof which, inter alia, argued that on the face of the pleading, limitations had run, plaintiffs amended the date "to conform to the evidence" to read 1975. This was the ninth amendment made by plaintiffs to their pleadings.
[4] Plaintiffs have heretofore disclaimed any purpose to state a derivative claim and Count I does not purport to state one.
[5] It is indisputable that plaintiffs knew the fact of the alleged wrongful self-dealing prior to the filing of this suit on May 26, 1976, in view of the fact that their original complaint alleged this conduct and the record in the state court valuation case reflects that the information was known to plaintiffs a substantial period of time prior to the trial of that case, which, as we have noted, did not commence until June 8, 1976.
[6] This claim first surfaced after the remand of this case.
[7] We recognize that plaintiffs are not satisfied with the value of their stock as determined in the state trial and as affirmed by the Missouri Court of Appeals. However, as noted supra, the evidence on which they now rely was then known and available to them for use in the determination of value.
[8] Under the Missouri law in effect at the time of the levy (Section 513.120 RSMo.1969) it was not essential that certificates of stocks be physically seized. See State ex rel. North American Co. v. Koerner, Mo.1948, 211 S.W.2d 698. The Uniform Commercial Code which requires actual, as distinguished from constructive, seizure became effective July 1, 1965, subsequent to the levy.
[9] There are apparent inconsistencies in the allegations of this count. Obviously, under the allegations of Counts I, II, III, IV, V, VII, VIII, X and XI the Wiggins were not fiduciaries with "insider" information prior to their acquisition of a controlling, majority, interest in Med-Science. Yet plaintiffs plead that the purchase of some 70% of the securities occurred while the Wiggins were "fiduciaries."