**Coy R. GROGAN and John Henson, Appellees,**

v.

**Frank J. GARNER, Jr., Appellant.**

**No. 85–2098.**

United States Court of Appeals, Eighth Circuit.

Submitted June 9, 1986.

Decided Dec. 8, 1986.

Rehearing Denied Jan. 20, 1987.

---

Arthur H. Stoup, Kansas City, Mo., for appellant.

Thomas M. Franklin, Kansas City, Mo., for appellees.

Before LAY, Chief Judge, ARNOLD, Circuit Judge, and STROM,* District Judge.

LAY, Chief Judge.

Coy R. Grogan and John H. Henson brought this diversity action against Frank J. Garner, Jr., alleging that Garner committed common law fraud, breached his fiduciary duties, and violated § 10(b) of the Securities Exchange Act of 1934. The suit arises from the sale by Garner of stock in STI–Kansas to North American Car Corporation (NACC). A jury returned a verdict for Grogan and Henson and awarded $249,000 actual damages on each of three counts as well as punitive damages of $24,900 on the fraud claim.

After the jury returned its verdict and the judgment was filed, Grogan and Henson filed a motion for an award of prejudgment interest on the judgment. Garner moved for a judgment notwithstanding the verdict or a new trial and to amend the judgment as duplicitous. The court[1] held that Grogan and Henson individually could receive no more than $249,000 in actual damages and $24,900 for punitive damages on the fraud claim but did not require the plaintiffs to elect the count upon which the judgment for actual damages was based. The court also awarded prejudgment interest only as to the § 10(b) claim at nine

percent per annum from April 17, 1979, to the date of the judgment. Garner appeals.

**Facts**

Our review of the record in the light most favorable to the verdict holder, *Lowe v. E.I. Dupont deNemours Co.,* 802 F.2d 310, 311 (8th Cir.1986), reveals the following facts. STI–Missouri was a Missouri corporation established by Frank Garner, Jr., in 1976. Garner's son, Franklin III, originally was the sole stockholder and president of the corporation. The elder Garner eventually began working full-time for STI–Missouri, at which time his son relinquished all capital stock in the corporation to his father. In 1976, Garner invited both Grogan and Henson to join STI–Missouri as employees in return for 100 shares, approximately ten percent, of the company stock. Grogan and Henson accepted the offer and paid approximately $800 each for their shares. At the same time, several other individuals also became minority shareholders in the corporation.[2] Garner retained approximately fifty-five percent of STI–Missouri shares, and until the time the corporation was sold, he served as president and chief executive officer.

In 1977, Garner began investigating the possibility of forming a wheel shop to supply wheels for the railcars that STI–Missouri repaired and refurbished. Garner estimated that start-up costs would total 3.5 to 4 million dollars. However, he needed $50,000 immediately for a down payment on equipment and construction. Garner obtained the approval of STI–Missouri shareholders to have STI–Missouri borrow $100,000 so that funds could be loaned to STI–Kansas by STI–Missouri.[3] The STI–Kan-

---

* The HONORABLE LYLE E. STROM, United States District Judge for the District of Nebraska, sitting by designation.

1. The Honorable Scott O. Wright, United States District Court for the Western District of Missouri, presiding.

2. STI–Missouri shares were distributed as follows:

Frank Garner, Jr.—600 shares
John Buffalo—100 shares
Tom Garner—100 shares
Coy Grogan—100 shares
John Henson—100 shares
Raymond Guzak—25 shares
Robert Guzak—25 shares
Charles Pitts—25 shares
Douglas Weitzman—25 shares

3. Garner collateralized the loan with personal farm property.

sas debt was carried as an account receivable on STI–Missouri's books, thereby enhancing the net worth of STI–Missouri.

In January, 1978, NACC expressed to Garner its interest in buying STI–Missouri's car shops, which by then were located in several states. After two and one-half months of negotiations, NACC discontinued its efforts to buy the company. At the same time, Garner was still attempting to raise working capital for STI–Kansas. He notified all STI–Missouri shareholders in May, 1978, that he would like to incorporate STI–Kansas and that shareholders of STI–Missouri could purchase one percent of STI–Kansas for $40,000, with STI–Missouri retaining twenty to thirty percent of STI–Kansas stock. All STI–Missouri shareholders, including Grogan and Henson, declined Garner's offer, and Garner did not further pursue this plan.

On October 10, 1978, Garner notified all shareholders of the annual STI–Missouri shareholders meeting. In his letter, Garner stated that the meeting was for the purpose of reviewing the company's financial position and discussing the status of the wheel shop and other subsidiary car shops. In the meantime, NACC had expressed renewed interest in purchasing STI–Missouri and its affiliates, including the wheel shop. On October 17, 1978, NACC presented Garner with a letter of intent to purchase STI–Missouri, a number of the car shops, and the wheel shop. The sale was subject to final approval of NACC's board of directors and all shareholders of the STI enterprise. Because he

now had a firm offer from NACC, Garner testified, he contacted each STI–Missouri shareholder by telephone and urged him to attend the October 21 meeting. Both Grogan and Henson attended.

On September 26, 1978, approximately one month before the shareholders meeting, STI–Kansas was incorporated, with Garner as its sole shareholder. At the time of incorporation, STI–Kansas remained unfunded and indebted to STI–Missouri. Grogan and Henson both testified that they were unaware of either the incorporation or of Garner's status as sole stockholder. On September 30, Garner purchased 500 shares of STI–Kansas common stock for one dollar per share, and on October 17, he purchased another 170 shares at the same price.[4]

Although Garner at one time had offered one percent of STI–Kansas for $40,000, he now determined, as reflected in a series of memos dated October 2, 1978, to distribute STI–Kansas stock to certain employees of the company in exchange for one dollar per share and an employment commitment.[5] These transactions were completed on November 17, 1978, after the October 21 meeting but before closing the sale to NACC.

The parties' versions of what happened at the October 21 meeting differ substantially. Grogan and Henson testified that Garner represented to the shareholders that the 2.3 million dollar offer from NACC included the purchase of all STI facilities, including STI–Kansas.[6] NACC's letter of

---

4. The record is unclear whether Garner purchased more than 670 shares of STI–Kansas. The plaintiffs at one point state that Garner owned 840 shares before he distributed them as indicated below. This amount appears consistent with Garner's share at closing of stock in Tiger International, NACC's parent corporation, which was 67%.

5. Garner distributed the shares of STI–Kansas stock as follows:
   Tom Garner—85 shares
   John Buffalo—80 shares
   Frank Garner, III—60 shares
   Marge Garner—25 shares
   Pacey Wohlner—25 shares
   Gilbert Liebig—25 shares

   Russell DeBerg—10 shares
   Richard Jardine—10 shares
   Wayne Leigh—10 shares

6. Garner distributed the following proposal:
   SURFACE TRANSPORTATION INTERNATIONAL, INC. has received an offer from North American Car Corporation to purchase 100% of the outstanding stock of STI. Therefore, the vote of the Stockholders must be unanimous in favor of the stock purchase if we are to proceed further with the negotiations.
   Anything less than 100% of the stockholders voting affirmatively will immediately stop further negotiations with regard to the sale of

intent which, according to Grogan and Henson, Garner never distributed, revealed that NACC offered to pay separately for STI–Kansas by a stock exchange and extended an employment offer to Garner. Ultimately, NACC swapped shares of its parent corporation, Tiger International, valued at over 2.5 million dollars, for shares of STI–Kansas. Grogan and Henson claim that they did not learn of the separate consideration tendered for STI–Kansas until 1983. Had they known of the full transaction, they claim, they would not have agreed to sell their stock to NACC.

Garner, on the other hand, presented evidence that he disclosed at the October 21 meeting that he was the sole shareholder in STI–Kansas and that he distributed NACC's letter of intent. He also testified that he offered both plaintiffs the opportunity to become employees of STI–Kansas, but both failed to pursue the offer. Garner and John Buffalo further testified that Grogan received and reviewed the sales agreement before the closing on December 28 and 29, 1978. Grogan denies this. Garner and others also testified that all STI shareholders received a memorandum dated December 4, 1978, which set out the separate consideration for STI–Kansas. The plaintiffs deny receiving this memo.

On December 28 and 29, 1978, NACC purchased both corporations. Grogan and Henson received approximately $230,000 in cash and notes for their STI–Missouri stock. Besides cash and notes, Garner received for his STI–Kansas shares Tiger International stock worth $1,700,460 and an employment contract with NACC. Tom Garner and Jim Buffalo, the other two STI–Missouri shareholders also holding stock in STI–Kansas, received Tiger International stock worth $215,730 and $203,040 respectively. The remaining seven STI–Kansas shareholders received Tiger International stock valued at $418,680. The total value of exchanged Tiger International stock was $2,537,910.

**Discussion**

Grogan and Henson claim they were not advised before, during, or after the October 21 meeting (1) that the wheel shop had been incorporated in September, 1978; (2) that STI–Kansas stock was sold for one dollar per share and employment commitments; (3) that those purchasing STI–Kansas stock from Garner were handpicked employees and relatives; and (4) that NACC paid a separate consideration, by way of Tiger International stock worth over 2.5 million dollars, for STI–Kansas. They allege that Garner misrepresented to them that the proposal of sale included the full consideration for both STI–Missouri and STI–Kansas. They urge that they were at all times led to believe that STI–Kansas was a division of STI–Missouri and that their ten percent interest in STI–Missouri properly included a proportionate interest in the assets of STI–Kansas. They

STI and its subsidiaries to North American Car Corporation. Each of you are admonished to fully understand what the offer would mean to you personally as a stockholder of STI before making your decision to sell or not to sell.

The subsidiaries to be included in the sale are:
The Kansas City Car Shops (Two Shops, both Leased);
The Ferriday Louisiana Shop;
The Toledo Ohio Shop (Leased);
The Superior, Wisconsin Shop;
The South Dakota Facility—10 year Management Contract;
Assets and outstanding stock of S.T.I. Special Services;
Assets and outstanding stock of Air and Surface Transportation International;
Rail Transportation Specialists—5 year Management Contract;

S.T.I.X. Car Leasing (an inactive corporation)
*Assets of Wheel Shop (Not funded at this time)*
[emphasis added]
I understand the offer for STI and the above-listed subsidiaries is $300,000 cash at closing and $2 million in North American notes or Tiger International stock, or a combination of both notes and stock. The cash to be distributed equally at closing based upon percentage of ownership. (See attached Example).
Stock or notes to be paid over a 10-year period at 8% interest, payable in 10 equal payments, plus interest, with first payment to be July of 1979. (See attached Example).
I vote YES to accept the North American Offer.
I vote NO to the offer of North American.
    BY _____
Dated: October 21, 1978.

therefore argue that they were entitled to ten percent of the value of the Tiger International stock, based on their ten percent ownership of STI–Missouri. Grogan and Henson claim they were individually defrauded when Garner misrepresented the terms of NACC's offer, and that by his actions, Garner breached a fiduciary duty owed them and violated § 10(b) of the Securities Exchange Act of 1934.

Garner appeals, citing numerous errors that we will attempt to summarize: (1) the plaintiffs had no standing to sue because any injury sustained was to the corporation, requiring a derivative action; (2) the plaintiffs failed to prove sufficient evidence to sustain their claims for liability and damages; (3) the trial court committed various errors in its jury instructions; (4) the trial court erred in refusing to allow certain expert testimony; (5) the trial court erred in granting a post-verdict award of prejudgment interest on the § 10(b) claim; and (6) the trial court erred in not requiring the plaintiffs to elect among remedies.

### Standing—Derivative Suit

We turn initially to the question of whether the suit should have been brought as a derivative action. The parties agree that Missouri law controls the issue. Whether a suit is properly brought as an individual action turns on whether the plaintiff has suffered an injury distinct from one incurred by the corporation. As one commentator has observed, "[i]f the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is a party, or on a right belonging severally to him, or *on a fraud affecting him directly*, it is an individual action." 12B Fletcher Cyclopedia Corporations § 5911 (Perm.Ed.1984) (emphasis added); *see also Gieselmann v. Stegeman*, 443 S.W.2d 127 (Mo.1969). In such a case, an individual stockholder may sue to redress direct injury to himself, even if the same violation also injured the corporation. 12B Fletcher *supra*.

In *Dawson v. Dawson*, 645 S.W.2d 120 (Mo.App.1982), a shareholder in the corporation sued individually and derivatively for an injunction and an accounting regarding an alleged illegal stock transfer from a director to another stockholder. The plaintiff claimed standing based upon his characterization of the director owing a fiduciary duty to each shareholder. While agreeing that a director is in a fiduciary relationship with shareholders as a whole, the court determined that "[c]orporate shareholders cannot in their own right and for their own personal use and benefit maintain an action for the recovery of corporate funds or property improperly diverted or appropriated by the corporation's officers and directors." 645 S.W.2d at 125. The court noted that "[w]here a complaint relates to the direct injury of the plaintiff, however, a derivative action may not be necessary." *Id.* Because the plaintiff failed to set forth facts showing how he had been individually harmed as a result of the improper stock transfer, the Missouri court concluded that he lacked standing to sue individually. *Id.*

We find *Dawson* inapposite to the facts in this case. Here, Grogan and Henson are not seeking redress for the misappropriation of corporate assets or property or for any wrong suffered by the corporation. Instead, they seek individual damages because Garner deceived them about the circumstances under which NACC acquired the STI enterprise. When this evidence is viewed in the light most favorable to the plaintiffs, as we are bound to do, there exists proof of misrepresentation by Garner that the entire consideration to be paid was in exchange for STI–Missouri *and* the assets of the wheel shop. Grogan and Henson allege additional evidence of fraud in Garner's failure to inform them of NACC's offer to buy separately the assets of the wheel shop, which was represented by Garner to be unfunded at that time, for an additional 2.5 million dollars. Grogan and Henson do not allege that Garner withheld assets of STI–Missouri; all the corporate assets of STI–Missouri, including STI–Kansas, were transferred for consideration to NACC when it acquired 100% of the STI

stock. Neither do they challenge the overall consideration tendered in the stock transfer.[7]

Moreover, in *Gieselmann v. Stegeman*, 443 S.W.2d 127 (Mo.1969), the Missouri Supreme Court held that in an action based upon a tort where an injury is done directly to a shareholder, the shareholder may bring suit on an individual basis and need not resort to a derivative action. *Gieselmann* involved six stockholders who brought an individual suit against several other shareholders and the corporation. The plaintiffs claimed that they had been fraudulently deprived of controlling stock in the corporation and of positions on the board and as officers. As the court noted, not every allegation in the petition was appropriate for an individual action. However, "[t]he *gravamen* of the pleading * * [was] injury to the plaintiffs *as individuals*," 443 S.W.2d at 131 (emphasis in original), and the court allowed the individual suit to stand.[8]

▪ There should be little question that the plaintiffs have standing to sue for their personal harm. The plaintiffs were asked to sell their stock for a stated price as represented in Garner's proposal of sale. Although the proposal concerned the sale of STI–Missouri, Garner made it clear that the shareholders should "fully understand what the offer would mean to you personally before making your decision to sell or not to sell." The shareholders were told that the consideration set forth was the full price to be paid for the STI enterprise, including the "Assets of the wheel shop (Not funded at this time)." This was an overall representation that NACC was paying the consideration set forth for *all* of the assets, including the wheel shop, and that plaintiffs' shares were to be ten percent of the entire consideration paid. Grogan and Henson had every right to believe that their ten percent interest included the assets of STI–Kansas as well as those of STI–Missouri.

Grogan and Henson testified and we must assume the jury found that on October 21, 1978, they did not know that Garner had incorporated the wheel shop and, with a few hundred dollars, purchased shares in it soon to be worth over two million dollars. Grogan and Henson also did not know that Garner had selectively distributed part of these shares to his relatives and certain employees. At the time of the NACC offer to buy the shares of stock of STI–Missouri, as communicated to the shareholders by Garner, Grogan and Henson were led to believe that STI–Missouri still owned all the assets of STI–Kansas and relied on that understanding when they approved the sale of their STI–Missouri shares of stock. Such reliance was reasonable considering that Garner represented in his May, 1978, letter that STI–Missouri would "retain 20–30% of STI–Kansas" after STI–Missouri

---

**7.** Had the plaintiffs challenged only the propriety of the pre-closing sale of STI–Kansas shares to certain employees of the corporation, then *Dawson* possibly would have been controlling because the plaintiffs would be challenging the sufficiency of consideration paid for STI–Kansas stock. Garner offered the stock to certain employees for one dollar per share plus an employment commitment. A few months earlier, before the NACC offer, Garner had offered the stock for $40,000 for one percent of the company. However, the plaintiffs are not asserting a preemptive right to buy STI–Kansas stock; they are claiming that they were defrauded by Garner's representation that the consideration paid by NACC was in exchange for all the assets of the STI enterprise, including the wheel shop. The thrust of Garner's misrepresentation goes to the value of the plaintiffs' individual interests, or ten percent of STI–Missouri stock.

**8.** Grogan and Henson also rely on a recent Missouri Court of Appeals decision to bolster their standing argument. In *Forinash v. Daugherty*, 697 S.W.2d 294 (Mo.App.1985), shareholders of a closely held bank corporation brought suit alleging that officers and directors secretly sold controlling stock interests at the expense and to the exclusion of minority shareholders. The primary issue in the case was whether Missouri holds controlling shareholders in a closely held corporation to a fiduciary duty to minority shareholders, and if so, whether that duty is heightened because of the nature of the corporation.

Garner argues, and we agree, that *Forinash* does not deal with the issue of when a derivative suit is required. In fact, the court never mentions whether the suit was brought as a derivative or individual action.

shareholders purchased percentages of STI–Kansas. Such reliance is also reasonable in light of the proposal of sale that listed the wheel shop as one of the "subsidiaries" of STI–Missouri.

No doubt, the plaintiffs could have brought a derivative action had they known all the facts at the October 21 meeting. However, this action does not turn solely on Garner's misappropriation of wheel shop assets but on the direct fraud committed by him when he misrepresented the terms of NACC's offer. In short, Garner's fraudulent actions prevented the plaintiffs from realizing the true value of their shares and maximizing that value in the sale to NACC. Grogan and Henson were directly harmed by Garner's misrepresentations, and they properly brought suit as individuals so harmed.[9]

### Sufficiency of the Evidence

■ Garner next argues that Grogan and Henson failed to produce sufficient evidence to sustain the jury's verdict. Although the record contains conflicting versions of the various transactions, the jury obviously believed the plaintiffs' version of what happened. This court cannot disturb a jury verdict if there is substantial evidence, viewed in the light most favorable to the plaintiffs, to support the verdict. *United States v. Lewis,* 759 F.2d 1316, 1352 (8th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985).

■ As part of his argument, Garner contends that there was insufficient evidence to establish causation for the alleged damages because neither plaintiff was an STI–Kansas shareholder. As we have already discussed, Garner miscomprehends the essence of the plaintiffs' claims. Grogan and Henson acknowledge that they were not STI–Kansas shareholders. They do not claim a right to be STI–Kansas shareholders, nor do they claim a preemptive right to buy STI–Kansas stock at one

dollar per share. Their allegations are grounded in Garner's fraudulent misrepresentation of the terms of the sale to NACC. Because of these misrepresentations, neither plaintiff was aware of the true value of his STI–Missouri stock. *See Myzel v. Fields,* 386 F.2d 718, 733 (8th Cir.1967), *cert. denied,* 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). This is especially significant not only in terms of dollar value, but also of bargaining power. NACC's offer was conditioned on 100% shareholder approval of the sale. Garner's fiduciary duties as a director and officer of STI–Missouri included the duty to disclose fully the terms of a sale affecting the plaintiffs' interests in STI–Missouri. We find substantial evidence, as did the jury, to support proof of fraud committed by Garner against the plaintiffs.

### Jury Instructions

■ Garner contends that the trial court committed various errors in its jury instructions. The trial court has broad discretion to instruct the jury in the form and language it considers a fair and adequate presentation of substantive law. *Garnes v. Gulf & Western Mfg. Co.,* 789 F.2d 637, 642 (8th Cir.1986). This court reviews jury instructions to determine whether, taken as a whole, they are confusing or misleading in presenting the principles of law applicable to the case. *Des Moines Bd. of Waterworks v. Alvord, Burdick & Howson,* 706 F.2d 820, 823 (8th Cir.1983).

■ We believe that the instructions as a whole fairly and adequately presented the substantive law and were neither misleading nor confusing so as to prejudice the defendant. Garner challenges instructions 6, 7, 12, 23, 24, and 29, not because they misstated Missouri law, but because they resulted in "redundant overkill" when the court separately instructed on misrepresentation and nondisclosure. To simultaneous-

---

9. One effect of a successful attack on the plaintiffs' individual suit would have been to destroy complete diversity jurisdiction. However, had this occurred, the plaintiffs point out that the § 10(b) claim establishes federal question juris-

diction so that the counts of common law fraud and breach of fiduciary duty would still be within the district court's pendent jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

ly instruct the jury on both, however, would have required the court to discuss dissimilar legal elements in one instruction. We find the court's separate instructions more in keeping with the objective of facilitating the jury's understanding of the substantive law.

■ Garner also challenges instructions 8, 9, 25, and 26, which relate to Garner's breach of fiduciary duty. The instructions described Garner's fiduciary duties to the plaintiffs as well as to the corporation. As we have already explained, Garner had a fiduciary duty to disclose fully to the plaintiffs the terms of NACC's offer, including the provisions relating to the wheel shop. The jury was properly instructed that it could find Garner guilty of breach of fiduciary duty if he failed to disclose the complete terms of the offer.[10]

■ We also find the district court was within its discretion when it used the appropriate legal terms to differentiate the various theories in the case. Much of Garner's objection to the instructions focuses on their form. He claims that they were not set out under the systemized approach mandated by the Missouri Approved Jury Instructions. We have noted on other occasions, however, that while instructions pertaining to claims for relief under diversity jurisdiction must fully and properly instruct on all the elements of controlling state law, the form of state-approved jury instructions is not binding on the district court. *Ferren v. Richards Mfg. Co.,* 733

F.2d 526, 530 (8th Cir.1984) (Missouri jury instructions).[11]

**Expert Testimony**

Garner next contends that the district court erred when it refused to allow the expert testimony of Richard Sewell, an accountant. Garner claims that Sewell's testimony regarding the tax consequences in 1978 of selling both STI–Missouri and STI–Kansas in one transaction would have critically undermined the plaintiffs' case. Sewell was allowed to testify about various STI financial statements, but plaintiffs' counsel objected when Sewell was asked about the tax ramifications of the sale of a business entity similar to the STI enterprise.[12]

■ The court excluded Sewell's testimony because Garner had failed to reveal in answers to interrogatories that he planned to use this expert testimony. Plaintiffs' Interrogatory No. 11 inquired, pursuant to Fed.R.Civ.P. 26(b)(4)(A)(i), as to the identity of the defendant's expert witnesses and the subject of their testimony. Garner's answer to this interrogatory did not indicate that the tax consequences of the transaction was a subject area to be testified to by an expert. After examining the interrogatory answer and questioning counsel about it, the district court excluded Sewell's testimony regarding potential tax ramifications of the sale. Generally, an appellate court will reverse the district court's decision to exclude evidence only when there has been an abuse of discretion. *See SCNO Barge Lines, Inc. v.*

---

10. Although Garner objected at trial to the fiduciary duty instructions, he did not offer an alternative instruction. A party may not complain on appeal that an instruction is ambiguous if he fails to offer a clearer instruction at trial. *Roth v. Black & Decker, U.S., Inc.,* 737 F.2d 779, 783 (8th Cir.1984).

11. Garner also claims error in the district court's failure to instruct on certain affirmative defenses. However, he has not preserved his right to appeal because he failed to timely object at trial. A party who tenders instructions but fails to object to the court's failure to give the proffered instructions waives the right to com-

plain on appeal. *DeFranco v. Valley Forge Ins. Co.,* 754 F.2d 293, 296 (8th Cir.1985).

12. Counsel for Garner asked Sewell the following question:

Q. And December of 1978, if someone would have sold the same business entities for a total of $2 million in cash, or $2.5 million in cash and $2.5 million worth of valued stock, of stock that supposedly had that value, would that whole transaction have been treated as a long-term capital gain or as some other transaction which would put it in a different tax rate? I don't want to know the rate. I just want to know the theory behind it.

*Anderson Clayton & Co.*, 745 F.2d 1188, 1192 (8th Cir.1984). The trial court did not abuse its discretion when it refused to admit this evidence.

### Damages, Prejudgment Interest, and Election of Remedies

Garner's final two claims of error relate to the damages awarded. Garner argues that the trial court erred in granting the plaintiffs' post-verdict motion for prejudgment interest on the § 10(b) claim and in not requiring the plaintiffs to elect the count under which they recovered their judgment. As we stated earlier, the jury originally awarded both Henson and Grogan $249,000 on each of the three counts, plus $24,900 punitive damages on the fraud count. The court adjusted the award so that each plaintiff received only one award of $249,000 plus punitive damages and prejudgment interest.

■■■ Punitive damages are not permitted in a § 10(b) claim. *Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1200 (8th Cir.1978). At one time, federal courts struggled with the question of whether § 28(a), 15 U.S.C. § 78bb, of the Securities Exchange Act of 1934 prohibits an award of punitive damages in a pendent state claim, even if state law permits such damages.[13] The courts now appear to uphold uniformly punitive damages awarded under these circumstances. *See, e.g., Nye v. Blyth Eastman & Dillon, supra* at 1200; *Ryan v. Foster & Marshall, Inc.*, 556 F.2d 460, 464 (9th Cir.1977); *Falks v. Koegel*, 504 F.2d 702, 706–07 (2d Cir.1974); *Coffee v. Permian Corp.*, 474 F.2d 1040, 1044 (5th Cir.), *cert. denied*, 412 U.S. 920, 93 S.Ct. 2736, 37 L.Ed.2d 146 (1973); *Young v. Taylor*, 466 F.2d 1329, 1337 (10th Cir.1972).

■■■ While the case law, including that of this circuit, clearly allows for recovery of punitive damages in pendent state claims, we have not before been faced with whether punitive damages on a common law claim and prejudgment interest on a federal claim are both recoverable when the plaintiff has prevailed on both. Unlike punitive damages, prejudgment interest in a § 10(b) claim is permitted and is within the sound discretion of the trial court.[14] *See Blau v. Lehman*, 368 U.S. 403, 414, 82 S.Ct. 451, 457, 7 L.Ed.2d 403 (1962); *Woods v. Barnett Bank*, 765 F.2d 1004, 1014 (11th Cir.1985).[15]

---

**13.** Section 28(a) provides in part:

The rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity; but no person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

**14.** Garner also argues that prejudgment interest was improper because it was not pled and submitted to the jury. While there is analogous case law to this effect, *see Segal v. Gilbert Color Systems, Inc.*, 746 F.2d 78, 82 (1st Cir.1984) (involving 28 U.S.C. § 1875, the Grand Jury Act); *Furtado v. Bishop*, 604 F.2d 80, 98 (1st Cir.1979) (involving 42 U.S.C. § 1983), *cert. denied*, 444 U.S. 1035, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980), it is clearly not the rule in this circuit in actions arising under the Securities Exchange Act of 1934. *See Western Auto Supply Co. v. Gamble-Skogmo Co.*, 348 F.2d 736, 744 (8th Cir.1965), *cert. denied*, 382 U.S. 987, 86 S.Ct. 556, 15 L.Ed.2d 475 (1966). An award of prejudgment interest in a § 10(b) case is within the sound discretion of the trial court and will be overturned only if it is so unfair or so inequitable as to require it. *Riseman v. Orion Research, Inc.*, 749 F.2d 915, 921 (1st Cir.1984). The trial court did not abuse its discretion when it awarded prejudgment interest on the § 10(b) claim.

**15.** Grogan and Henson did not cross-appeal the trial court's limiting the award of prejudgment interest to the § 10(b) count. Prejudgment interest in a diversity action is determined by the law of the state where the action arose. *California & Hawaiian Sugar Co. v. Kansas City Terminal Warehouse*, 788 F.2d 1331, 1333 (8th Cir. 1986). In Missouri prejudgment interest is generally appropriate when the amount due is liquidated or, although not strictly liquidated, is readily ascertainable by reference to recognized standards. *See St. Joseph Light & Power Co. v. Zurich Ins. Co.*, 698 F.2d 1351, 1355 (8th Cir. 1983) (citing *Denton Constr. Co. v. Missouri State Highway Comm'n*, 454 S.W.2d 44, 59–60 (Mo.1970). Because the issue was not raised on appeal, we make no judgment as to the propriety of prejudgment interest on the common law counts.

■ Garner's argument that the plaintiffs may not recover duplicitous damages is well taken, but we do not believe this requires an "election of remedies" in its traditional sense. Election of remedies is, in the words of one commentator, "the legal version of the idea that a plaintiff may not have his cake and eat it too." D. Dobbs, *Remedies* § 1.5 at 14 (1973). A plaintiff must elect among remedies when he has available inconsistent remedies for the redress of a single right. A plaintiff, for example, may sue for damages for the conversion of property or he may bring a replevin action to recover the property itself. *See Myzel v. Fields, supra* at 740–41. The doctrine and the cases interpreting it often "do no more than prevent double recovery," although the principle is not always clearly expressed or properly used. *Dobbs, supra.* However, the doctrine is remedial, and neither it nor the federal rules of pleading require an election of substantive theories. *Dobbs, supra* at 16; *see also* Fed.R.Civ.P. 8(a).

Grogan and Henson are not seeking inconsistent remedies requiring an election in the typical sense. They did not ask for a rescission of the contract of sale to NACC along with money damages. *Cf. Randall v. Loftsgaarden,* — U.S. —, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986) (plaintiff in § 10(b) case in some circumstances may choose between rescission and actual damages). They sought and were awarded money damages for the amount they considered their fair share of the overall consideration paid by NACC for the assets of STI–Missouri as represented by Garner.[16] They were also awarded punitive damages on the fraud count and prejudgment interest on the § 10(b) count.[17]

■ When a federal securities claim overlaps with a pendent state law claim, the plaintiff is entitled to the maximum amount recoverable under any claim. Jacobs, *The Measure of Damages in Rule 10b–5 Cases,* 65 Geo.L.J. 1093, 1166 (1977). This does not require an election of remedies. Instead, Grogan and Henson are each entitled to the greatest amount recoverable under any single theory pled, with actual damages plus prejudgment interest representing one single amount and actual damages plus punitive damages representing the other single amount. *Randall v. Loftsgaarden,* 106 S.Ct. at 3156 (Blackmun, J., concurring) (parties who prevailed on § 10(b) claim and on § 12(2) claim entitled to select the damage amount more favorable to them); *Aboussie v. Aboussie,* 441 F.2d 150, 157 (5th Cir.1971) (jury award under common law count upheld; new trial ordered to determine damages under 10b–5, with caveat that if federal damages are less than common law damages, the federal damages are extinguished); *cf. McDonald v. Johnson & Johnson,* 776 F.2d 767, 770 (8th Cir.1985) (fraud and contract claims constitute separate causes of action because defendant's illegal acts occurred at separate and distinct times; therefore, plaintiffs' collection of contract judgment does not preclude litigation of fraud claim). We therefore conclude that Grogan and Henson may receive one award of damages under either the § 10(b) claim or the common law claim, whichever is the greatest, and upon satisfaction of the judgment, the lesser damages are deemed extinguished.

The judgment in favor of Grogan and Henson is affirmed as to liability; the judgment for damages is modified in accord with the principles set forth herein.

**16.** Each plaintiff was awarded $249,000 in actual damages, or approximately 10% of the 2.5 million dollars paid for STI–Kansas.

**17.** Each plaintiff was awarded $24,900 in punitive damages, or 10% of the actual damages. The court awarded prejudgment interest at nine percent per annum from April 17, 1979, to the date of judgment.