**INTERNATIONAL BROADCASTING CORPORATION, Plaintiff,**

v.

**Terrill A. TURNER, Robert E. Johnson, Jr. and J & T Investors, Inc., Defendants,**

v.

**Thomas K. SCALLEN, Raymond W. Scallen, Sumner S. Young, Sy Samuels, Lawrence H. Beasley, Jr., and George K. Hagglund, Defendants–on–Counterclaim.**

Civ. No. 4–89–541.

United States District Court, D. Minnesota, Fourth Division.

April 9, 1990.

Michael J. Bleck, Darwin J. Lookingbill, Rebecca E. Bender, and Oppenheimer, Wolff & Donnelly, Minneapolis, Minn., for plaintiff and counterclaim defendants.

Allen I. Saeks, Lawrence J. Field, and Leonard, Street and Deinard, Minneapolis, Minn., and Jerre B. Swann, David A. Stockton, Laurel J. Lucey, Marisa P. Hallagan, and Kilpatrick & Cody, Atlanta, Ga., for defendants and counterclaimants.

## ORDER

DOTY, District Judge.

This matter is before the court on the parties' cross-motions to dismiss. Based on the briefs and arguments of counsel and the record, file and proceedings herein, and for the reasons identified below, defendants' motion to dismiss will be denied; plaintiff's motion to dismiss will be granted in part and denied in part.

## BACKGROUND

Plaintiff International Broadcasting Corporation ("IBC") is a Minnesota corporation engaged in the business of providing family entertainment. IBC owns the Harlem Globetrotters, the Ice Capades, Bob–Lowe Island, Great Escape and Fantasy Island Amusement Parks and Ice Chalets. Defendants Terrill A. Turner and Robert E. Johnson, Jr., are investors from Georgia who formed the corporation J & T Investors ("J & T") for the purpose of investing in IBC.

### A. Plaintiff's Allegations

In August 1988, J & T purchased a number of shares of IBC stock. Amended and Supplemental Counterclaims at ¶ 147. According to plaintiff's First Amended and Supplemental Complaint ("Complaint"), defendants began a campaign in the fall of 1988 to solicit proxies for IBC and to encourage other persons and entities to either purchase shares in IBC or consider purchasing the company. Defendants' alleged purposes were to manipulate the market for IBC stock, to attempt to take over IBC or to force IBC to buy defendants' stock at a premium.

On December 19, 1988, an article appeared in Portfolio Letter, an investment periodical, which quotes defendant Johnson as stating "[w]e'll try to get on the board and have some input, whether we can take it over is another matter." The article also states that, according to defendant Johnson, the Globetrotters and Ice Capades would be worth more as separate entities. The article allegedly implies that IBC's assets should be liquidated. The article contains a quote from Richard Ostberg, referred to as an "analyst of RAF Financial," a Denver brokerage firm whose clients allegedly own 150,000 shares of IBC, in which he states that "I think there will be a proxy fight and they'll (management) have a tough time fighting it."

IBC alleges that Ostberg is not a licensed broker and is working with defendants to solicit proxies and encourage a tender offer based on mischaracterizations

of IBC's value and IBC management's actions at a time when no schedule 14B proxy solicitation filings or 14D tender offer filings had been made by J & T. IBC further alleges that Ostberg, while acting as an agent for J & T, called a number of brokerage firms to discuss a leveraged buy out of IBC. Ostberg sent by mail and telecopy a summary document (referred to herein as the "buy out letter") to brokers and shareholders. IBC charges that the buy out letter inaccurately values IBC, suggests liquidation of IBC's assets and contains negative comments regarding IBC's management actions. The buy out letter allegedly implies self-dealing and breach of officer and director duties. The buy out letter also sets forth individual values for various segments of IBC including the Harlem Globetrotters, the Ice Capades, Bob-Lowe Island, Great Escape and Fantasy Island Amusement Parks and Ice Chalets. IBC asserts that those valuations are inaccurate and misrepresent the actual value of the different segments of IBC and of IBC as a whole.

The buy out letter also sets forth the "potential profit from acquiring and liquidating this corporation." According to IBC, the estimated potential profit misrepresents the value of IBC and the buy out letter falsely states "that management has neglected shareholder relations and failed to make clear the value of the company's assets while increasing their own salaries and benefits."

On May 24, 1989, J & T filed a Schedule 13D with the Securities and Exchange Commission ("SEC"). The form 13D states that J & T's purpose is to increase its ownership in the common stock of IBC, obtain representation on the board of directors of IBC and "explore alternatives to enhance shareholder values." According to IBC, J & T failed to disclose its true purposes in purchasing a large amount of IBC stock; namely, to take over IBC and split up and sell its assets.

On May 26, 1989, J & T filed Schedule 14B proxy solicitation materials. IBC alleges that J & T filed these materials long after proxy solicitations had been made by

J & T and their agents. Like the 13D, the Schedule 14B states that J & T's purpose is to solicit proxies for the election of nominees of J & T to IBC's board of directors. According to IBC, J & T again failed to disclose its true purpose for soliciting proxies.

On June 5, 1989, J & T filed an amended Schedule 13D with the SEC in which it states the following:

[J & T] does not intend to actively solicit proxies from other shareholders of the company for the purpose of electing Mr. Johnson and Mr. Turner to the board at the annual meeting of shareholders scheduled for June 23, 1989.... [J & T] intends to continue, however, to [seek] representation on the board of directors of the company through communications directly with the company. In addition, [J & T] may solicit proxies from not more than 10 shareholders of the company and/or may commence full scale proxy solicitation efforts at some future time.... [J & T] expect[s] to continuously review their relations with the company and its shareholders for the purpose of determining the best means of increasing the value of their common stock.... [J & T] believes that a corporate restructuring could, in the proper circumstances, result in an increase in the value of the common stock, and they have held discussions with various parties regarding the possibility of structuring such a transaction. However, as of the date hereof, [J & T] has not formulated or proposed to the company any such transaction, and there can be no assurance that they will formulate or propose to the company any such transaction in the future, or that adequate financing for any such transaction could be secured...."

On June 7, 1989, J & T filed an amended Schedule 14B which contained the same change in purpose set forth in the amended 13D. According to IBC, defendant Turner called IBC president and Chairman of the Board Thomas K. Scallen several times from April through June of 1989 threatening to take over IBC or demanding that IBC buy out J & T at a premium.

On June 23, 1989, through a letter to IBC's board, J & T made an offer to purchase IBC's outstanding common stock at $16 per share and announced the offer in a press release. According to IBC, the price of its stock increased 33 percent one week prior to the offer, and traded at an unusually high volume.

On October 3, 1989, J & T raised their offer to $18 per share. Once again, IBC stock allegedly traded at an unusually high volume shortly before the October 3, 1989, offer was announced. IBC alleges that defendant Johnson had a telephone conference with a Charlotte, North Carolina broker named John Rissanen, brother of one of Johnson's friends, Jouko Rissanen. In that telephone conference, Johnson purportedly disclosed J & T's true intentions regarding IBC, including J & T's planned offer for IBC and the timetable for the proposed offers. Johnson allegedly requested retail support from these and other brokers asking them to encourage investors and other brokers to purchase shares of IBC based on material non-public information which Johnson disclosed to them. IBC alleges that J & T and others acting on the basis of that material information known to them traded in IBC stock without disclosing the information to the press, to the SEC or to present and prospective IBC shareholders.

In an October 16, 1989, article in *The Business Journal,* a periodical published in the Charlotte, North Carolina area, Johnson purportedly confirmed that the buy out attempts of IBC will continue, stating, "what we set out to do, we'll finish." In the same article, John Rissanen reportedly declined to comment as to trades in IBC he had made for other accounts and stated he first took note of the stock after receiving a Shearson Lehman Hutton ("Shearson") research report. IBC alleges that according to a Shearson official, Shearson has never issued a research report on IBC.

IBC filed its First Amended Complaint on October 31, 1989. IBC alleges ten counts of violations of its statutory and common law rights. Counts I through VII allege violations of various provisions of the federal securities laws. Counts VIII and IX allege intentional and negligent misrepresentation. Count X alleges that defendants have defamed IBC. Defendants' motion requests dismissal of Counts I through IV and Count X on the grounds that, even assuming IBC's allegations to be true, IBC fails to state a claim for relief.

## B. *Defendants' Counterclaim*

Defendants filed their amended and supplemental joint answer and counterclaims on November 13, 1989. Defendants deny that they have committed any of the alleged violations and assert that their purpose for acquiring shares in IBC was to obtain representation on IBC's board of directors. Defendants maintain that they have remained true to this purpose during the course of their ownership of IBC stock and that IBC's allegations to the contrary are unfounded. Defendants allege that Scallen and the other members of IBC's board of directors have breached their fiduciary duties to IBC and IBC's shareholders. Five of the seven members of IBC's board of directors are named as counterclaim defendants. Defendants allege that they did not demand that IBC pursue defendants' derivative claims because a majority of the board of directors are named as counterclaim defendants and any such demand would have been futile. According to defendants the five individually named directors are puppets of Thomas Scallen. Director Raymond W. Scallen is Scallen's brother. Director Sy Samuels is president of Samuel Artists and Productions, which was employed by IBC in 1986 to produce the shows of the Glorious Ladies of Wrestling. Director Lawrence H. Beasley, Jr., is president of Apache Plastics, Inc., a corporation that is wholly owned by Scallen. Defendants identify six decisions of the IBC board which allegedly violate the board's fiduciary obligations:

### 1. Personal Guarantees

Counterclaim defendants allegedly breached their fiduciary duties by adopting a series of transactions granting Scallen substantial stock options and excessive

fees for his personal guarantee of certain IBC obligations. In 1985, IBC granted Scallen an option to purchase 8,000 shares of common stock reportedly as consideration for his personal guarantee of a loan obligation of IBC. In January 1986, IBC granted Scallen an option to purchase 200,000 shares of IBC common stock, again purportedly as consideration for Scallen's personal guarantee of an IBC obligation. IBC paid Scallen fees of $150,000 in December 1986, $150,000 in February 1987, and $175,000 in June 1988, all allegedly paid as consideration for Scallen's personal guarantee of IBC obligations. Scallen was due to collect another fee of $150,000 in 1989 for his personal guarantee of a 1.5 million dollar promissory note that IBC gave in connection with the acquisition of certain assets from Charles R. Wood and his affiliated entities. This latter transaction (the "Wood transaction") is described in more detail below.

Counterclaim plaintiffs allege that in at least two instances Scallen was released from his guarantees within several months after they were given. Scallen's personal guarantees allegedly were not necessary to complete the underlying transactions to which they applied, but rather were devised by Scallen as a means of enriching himself.

In March 1986, Scallen exercised the option to purchase 200,000 shares of IBC common stock given him for his personal guarantee of IBC debt. According to the counterclaim plaintiffs, Scallen paid for the stock by giving IBC a promissory note in the amount of $300,000. The counterclaim plaintiffs allege that Scallen never paid IBC any portion of the amount due under the note. Instead, in September 1986, Scallen allegedly used his position as chairman of the board of directors of IBC to cause IBC to offset against the note a $150,000 debt that Scallen claims IBC owed him for certain "cash advances" that Scallen allegedly made to IBC. In February 1987, Scallen again allegedly offset another $150,000. The counterclaim plaintiffs allege that these offsets were created by Scallen as a means of funneling corporate assets from the treasury of IBC into Scallen's personal account in breach of his fiduciary duties.

## 2. Employment Agreements

Defendants further allege that the counterclaim defendants breached their fiduciary duties in adopting employment agreements with Scallen that provided excessive compensation. Scallen received an annual salary of $120,000 under a 1983 employment agreement. The 1983 agreement permitted the salary to be increased from time to time. The board increased Scallen's salary in 1987 to $250,000 and again in 1989 to $375,000. Defendants allege that these amounts did not include the excessive guarantee fees that Scallen received from IBC and did not include substantial retirement and death benefits contained in the 1983 employment agreement. The 1983 agreement required Scallen to spend only such time with IBC as he personally deemed necessary to perform his duties. Defendants allege that Scallen has been and is absent from IBC for long periods of time and does not devote sufficient efforts to IBC.

In 1989, IBC's board adopted a new employment agreement which provided that Scallen receive an annual salary of $495,000 and retirement benefits of $10,000 per month for a mandatory 10 year term. Scallen is still required to devote to IBC affairs only such time as he deems necessary.

## 3. Wood Transaction

In May 1989, IBC acquired substantially all of the assets of the "Great Escape" and "Fantasy Island," two family amusement parks previously owned by Charles R. Wood and his affiliated entities ("Wood"). The counterclaim plaintiffs allege that for those assets IBC paid Wood 22.8 million dollars in cash, gave a three year promissory note for 1.5 million dollars and agreed to employ Charles R. Wood for three years at an annual salary of $250,000. In addition, IBC issued to Wood 1.2 million shares of IBC common stock. According to defendants, Scallen caused the Wood stock to be restricted by a shareholder's agreement that requires Wood to vote the stock in accordance with Scallen's personal wishes

and prevents Wood from disposing of his shares to any person not approved by Scallen. Defendants allege that the sole purpose and effect of these restrictions is to increase Scallen's personal control over IBC from 13.5 percent to 48 percent of the total shares outstanding. Scallen allegedly did not provide IBC any benefit in exchange for this control of IBC.

IBC's stock is listed with the National Association of Securities Dealers, Inc. ("NASD"). According to defendants, the IBC board breached its fiduciary duties by failing to comply with two NASD listing requirements in approving the Wood transaction. First, the board failed to secure shareholder approval of the issuance of 1.2 million shares of IBC common stock to Wood. NASD listed companies are required to secure shareholder approval of business acquisitions where securities are issued resulting in an increase in outstanding common stock of 25 percent or more. The 1.2 million shares issued to Wood constituted more than 35 percent of the then outstanding IBC common stock.

Second, NASD market list companies are required to maintain an audit committee. According to defendants, the IBC board has failed to appoint such an audit committee.

### 4. Supermajority Voting Provision

In 1984, the IBC board amended its Certificate of Incorporation to include a provision that requires the affirmative approval of 80 percent of its outstanding shares for major corporate transactions, a so-called supermajority provision. According to defendants, the board breached its fiduciary duties by adopting that provision. The board also allegedly failed to file proxy materials required under the federal securities laws in connection with the meeting at which the supermajority provision was considered and adopted.

### 5. Poison Pill

On May 5, 1989, the board adopted a "poison pill" stock purchase plan. The plan provides a dividend of one right for each share of common stock of IBC outstanding on May 17, 1989. Each right initially entitles its holder to purchase one share of common stock of IBC for an exercise price of $50; on the date the rights were declared, IBC common stock closed at ten and seven-eighths. The plan contains a "flip in" provision under which holders of the rights are given the opportunity to purchase two shares of common stock for the price of one share if any person becomes the beneficial owner of 20 percent or more of the common stock. The 20 percent beneficial owner is not given the same opportunity. Defendants allege that the "flip in provision" prevents any entity from acting to acquire IBC because when the 20 percent threshold is crossed, the equity and voting power of stock acquired in IBC might be severely diluted by the rights holders exercising their rights.

### 6. Offer

On June 23, 1989, J & T offered to negotiate the purchase of all outstanding shares of IBC common stock at $16 per share. The board rejected J & T's offer on June 27, 1989. The board stated that the offer "was wholly inadequate and not in the best interests of shareholders." Defendants allege that Scallen and the board breached their fiduciary duties in rejecting this offer.

IBC seeks dismissal of defendants' counterclaims on the grounds that defendants lack standing.

### DISCUSSION

When analyzing cross motions to dismiss the court must look to the complaint and counterclaim as pled. The pleadings must be liberally construed and viewed in the light most favorable to the non-moving party. Dismissal is not appropriate "unless it appears beyond doubt that [plaintiff or counterclaimant] can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

### A. *Defendants' Motion to Dismiss*

#### 1. Count I

■ IBC alleges in Count I that defendants' May 26 and June 7, 1989, Schedule

14B proxy filings violated Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1982) and Rule 14a–9, 17 CFR § 240.14a–9 (1989), adopted by the SEC pursuant to that section. Rule 14a–9 provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement ... containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading....

To establish a cause of action for a violation of Rule 14a–9, it has been held that a plaintiff must demonstrate: " '(1) that the proxy materials contain a false or misleading statement of a material fact or omit to state a material fact necessary in order to make the statement made not false or misleading; (2) that the misstatement or omission of a material fact was a result of knowing, reckless or negligent conduct; and (3) that the proxy solicitation was an essential link in effecting the proposed corporate action.' " *Halpern v. Armstrong,* 491 F.Supp. 365, 378 (S.D.N.Y.1980) (quoting *Berkman v. Rust Craft Greeting Cards,* 454 F.Supp. 787, 791 (S.D.N.Y. 1978)).

Using this formulation, IBC's allegations state a cause of action for violation of Section 14(a). IBC alleges that defendants omitted to state in their Schedule 14B that they intended to take over IBC, divide its assets, and sell it. IBC further alleges that defendants acted with scienter, knowingly or recklessly filing misleading proxy information in their Schedule 14B, and that this filing has caused it damage necessitating injunctive relief.

■ Defendants argue that IBC's Section 14(a) claim must be dismissed because the filing of their Schedule 14B did not cause any transaction which IBC alleges has damaged it. This argument must fail. The element of causation can be sufficiently proved where there is a real threat of reoccurrence of an alleged proxy violation in the context of a future transaction. *Wisconsin Real Estate Investors Trust v. Weinstein,* 530 F.Supp. 1249, 1251–52 (E.D. Wis.1982). In this case, defendants expressly stated in their amended Schedule 14B that they may commence full-scale proxy solicitation efforts at some future time. Complaint at ¶ 28. Accordingly, defendants' motion to dismiss Count I of IBC's complaint is denied.

### 2. Count II

■ IBC claims in Count II that the Schedule 13Ds defendants filed on May 24, 26 and June 5, 1989, violates Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d)(1) (1981). Section 13(d) provides:

> Any person who, after acquiring ... beneficial ownership of any equity security ... is directly or indirectly the beneficial owner of more than 5 percentum of such class shall, within ten days after such acquisition, send to the issuer ..., send to each exchange where the security is traded, and file with the [Commission], a [Scheduled 13D] statement containing ... the following information.... (c) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure....

15 U.S.C. § 78m(d)(1) (1981).

IBC alleges that defendants' Schedule 13D forms fail to disclose their intent to control and liquidate IBC. IBC requests injunctive relief. A private cause of action exists in this circuit for the purpose of obtaining injunctive relief under Section 13(d). *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240, 248 (8th Cir.1979). Defendants argue that dismissal of Count II is required because they no longer own 5 percent of IBC common stock. Injunctive relief regarding "future contingencies" may be awarded in an action under Section 13(d) in appropriate circumstances. *Chromalloy,* 611 F.2d at 248

n. 16. Dismissal of IBC's Section 13(d) claim at this stage in the proceedings would therefore be premature. Accordingly, defendants' motion to dismiss Count II is denied.

### 3. Count III

■ IBC claims in Count III that defendants violated Section 14(e) of the Securities Exchange Act, 15 U.S.C. § 78n(e) (1982). Section 14(e) provides in pertinent part that:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive or manipulative, acts or practices, in connection with any tender offer or request or invitation for tenders or any solicitation of security holders in opposition to or in favor of any such offer, request or invitation.

Plaintiff alleges that defendants have failed to disclose their true intentions to achieve control of IBC and that they are insiders with respect to the trading of IBC stock. Plaintiff further alleges that defendants have knowingly or recklessly failed to file the required schedule for a tender offer. Plaintiff alleges that those acts and omissions have caused and are causing it damage. Complaint at ¶ 59–65.

Defendants argue that Count III must be dismissed because they have made no tender offer. The court concludes that a determination of whether defendants have yet made a tender offer would be premature at this stage in the proceedings. Accordingly, defendants' motion to dismiss Count III is denied.

### 4. Count IV

■ Plaintiff claims in Count IV that defendants have violated Section 18(a) of the Securities Exchange Act, 15 U.S.C. § 78r (1982). Defendants argue that Count IV must be dismissed because IBC has not alleged and cannot allege that it has "purchased or sold a security at a price" allegedly affected by misleading statements filed with the SEC as required under Section 18(a). *See* 15 U.S.C. § 78r(a) (1982). Purchase or sale of securities and injury directly resulting therefrom is a prerequisite of a claim under Section 18(a). *Hoover v. Allen*, 241 F.Supp. 213, 223–225 (S.D.N. Y.1965).

Defendants are correct that IBC fails to allege that it was a purchaser or seller of securities affected by defendants' alleged misleading filings. IBC argues, however, that under Rule 8(a)(2) of the Federal Rules of Civil Procedure it need only give notice of its claim for relief and need not allege that it was a purchaser or seller of securities injured by defendants' misleading filings. The court agrees. *See Bramlet v. Wilson*, 495 F.2d 714, 716 (8th Cir.1974) (a complaint should not be dismissed for not stating with precision all elements that give rise to a legal basis for recovery); *Sparks v. England*, 113 F.2d 579, 581 (8th Cir.1940) ("the Rules of Civil Procedure do not require that a plaintiff shall plead every fact essential to his right to recover the amount which he claims"). A complaint is sufficient if it "contain[s] allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial." *Comerio v. Beatrice Foods Co.*, 595 F.Supp. 918, 920 (E.D. Mo.1984) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216 (1969)). Accordingly, defendants' motion to dismiss Count IV is denied.

### 5. Count X

Plaintiff claims in Count X that defendants have defamed it in contravention of its common law rights. Defendants argue that dismissal of Count X is required because plaintiff fails to allege with sufficient specificity the alleged defamatory statements on which it bases its claim. The court disagrees. *See* Complaint at ¶¶ 16–20 and 138. Accordingly, defendants' motion to dismiss Count X must be denied.

### B. *IBC's Motion to Dismiss Defendants' Counterclaim*

#### 1. Derivative versus Individual Action

IBC argues that dismissal of defendants' counterclaims is required on the grounds

that defendants, as corporate raiders, lack standing to pursue their counterclaims because defendants' counterclaims are derivative in nature. If the claims are derivative, defendants are required to comply with Rule 23.1 of the Federal Rules of Civil Procedure. IBC claims that defendants have failed to meet three requirements of that rule and therefore defendants' counterclaims must be dismissed. Alternatively, IBC requests the court to stay the proceedings on defendants' counterclaims pending determination of the viability of those claims by a special litigation committee which has been formed for that purpose pursuant to Minn.Stat. § 302A.241 (1988).

■ Defendants and counterclaim plaintiffs argue that they need not comply with Rule 23.1 because their counterclaims are not derivative. Whether a claim is properly brought as an individual action rather than derivative turns on whether the claimant has suffered an injury distinct from one incurred by the corporation. *Grogan v. Garner*, 806 F.2d 829, 834 (8th Cir.1986) (applying Missouri law). In *Garner*, the court stated: "As one commentator has observed, '[i]f the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is a party, or on the right belonging severally to him, or *on a fraud affecting him directly*, it is an individual action.'" *Id.* (quoting 12B Fletcher, *Cyclopedia on the Law of Corporations*, § 5911 (Perm.Ed.1984)) (emphasis in the original). It is well settled that in the struggle for corporate control a tender offeror has standing "to challenge the actions of the target management exercised in the course of defending against the offer." *Torchmark Corp. v. Bixby*, 708 F.Supp. 1070, 1078 (W.D.Mo.1988) (quoting *Crouse–Hinds Co. v. Internorth, Inc.*, 518 F.Supp. 390, 403 (N.D.N.Y.) *appeal on this ground dismissed*, 634 F.2d 690, 692 n. 1 (2nd Cir.1980) (citations omitted)); *see CRTF Corp. v. Federated Dept. Stores, Inc.*, 683 F.Supp. 422, 428–432 (S.D.N.Y. 1988) (tender offeror has standing to challenge a target company's poison pill).

■ In distinguishing between a personal and derivative action a court is required to look at the counterclaims. *Crouse–Hinds Co. v. Internorth, Inc.*, 518 F.Supp. at 402. A number of the defendants and counterclaim plaintiffs' claims are clearly derivative in nature, and the corporate actions were not adopted as defensive tactics in response to defendants' takeover advances. Counts V, VI, VII and VIII regarding the adoption by the board of the supermajority voting provision in 1984 involve claims of misconduct occurring four years before defendants became shareholders. Accordingly, IBC's motion for dismissal of Counts V, VI, VII and VIII of defendants' counterclaim must be granted.

■ Counterclaim plaintiffs' claims in Counts I and II regarding alleged violations of corporate director's fiduciary duty by adopting Scallen's personal guarantee agreements must also be dismissed for lack of standing. All but one of the personal guarantee agreements were adopted before counterclaimants became shareholders. The personal guarantee agreement adopted in 1989 cannot be said to have inflicted an injury on counterclaimants separate and distinct from all shareholders of IBC. The adoption of the guarantee agreement is also not a defensive measure which would bar counterclaimants' takeover attempt. Since counterclaimants have failed to make a demand on IBC prior to filing a derivative claim as required under Rule 23.1 regarding the adoption of the personal guarantees, and since the court further concludes that such a demand would not have been futile, plaintiff's motion to dismiss Counts I and II is granted. For the same reasons, counterclaimants' claims regarding alleged breach of fiduciary duty in adoption of Scallen's employment agreements must also be dismissed.

■ Plaintiff's motion for dismissal of counterclaimants' claims for breach of fiduciary duty regarding adoption of the poison pill and the Wood transaction and rejection of counterclaimants' $16 offer is denied. Each of these board decisions were arguably made in order to defend against counterclaimants' takeover advances. Plaintiff

argues that counterclaimants' reliance on cases giving standing to a tender offeror is misplaced because counterclaimants have consistently maintained that they are not tender offerors. This argument must fail. Plaintiff alleges in its complaint that defendants are tender offerors and argues in its motion in opposition to defendants' motion to dismiss that any determination on the question of whether they are tender offerors is inappropriate at this stage in the proceedings. Since the court has agreed with plaintiff that such a determination would be premature regarding defendants' motion to dismiss, the court must also hold that such a determination would be premature as to plaintiff's motion to dismiss. Accordingly, plaintiff's motion to dismiss Counts III, IV, IX, X, XI, XII, XIII and XIV of defendants' counterclaim is denied.

2. Special Litigation Committee

 Plaintiff's request for a stay of proceedings on defendants' counterclaims pending a determination of a special litigation committee formed pursuant to Minn. Stat. § 302A.241 (1988) is denied. Two of the three committee members are named counterclaim defendants. The third committee member was appointed to IBC's board as Charles Wood's designee pursuant to terms of the challenged Wood transaction. The special litigation committee accordingly is not sufficiently independent and disinterested in the remaining claims to warrant the granting of the requested stay.

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Defendants' motion to dismiss is denied.

2. Plaintiff's motion to dismiss defendant and counterclaim plaintiffs' counterclaim is granted on Counts I, II, V, VI, VII and VIII.

3. Plaintiff's motion to dismiss defendants and counterclaim plaintiffs' counterclaim is denied on Counts III, IV and IX–XIV.

4. Plaintiff's motion for a stay of proceedings on defendants' counterclaim is denied.